AIRCRAFT OWNERS AND PILOTS ASSOCIATION and Max Karant, Frank K. Smith, and William D. Strohmeier on behalf of themselves and all others similarly situated, Plaintiffs,

v.

PORT AUTHORITY OF NEW YORK, a Municipal Body, et al., Defendants.

No. 68 C 775.

United States District Court
E. D. New York.

Sept. 9, 1969.

Joseph Lesser, New York City (Sidney Goldstein, Isobel E. Muirhead, Arthur P. Berg, and Herbert Ouida, New York City, of counsel), for Port of New York Authority, and another, for the motion.

Judah I. Labovitz, Philadelphia, Pa. (Laurence Rosenthal, Strasser, Spiegelberg, Fried & Frank, New York City, and Wolf, Block, Schorr & Solis-Cohen,

…

Philadelphia, Pa., of counsel), for plaintiffs opposed.

Howard G. Law, Jr., New York City, for Lawyer Pilots Bar Association, amicus curiae.

MEMORANDUM and ORDER

DOOLING, District Judge.

The plaintiff association of aircraft owners and pilots and sixteen individual pilots and owners as plaintiffs and intervenors have sued to enjoin the further enforcement by the defendant Port of New York Authority of a "take-off" fee of twenty-five dollars exacted from each aircraft landing or taking off from the three major New York area airports during certain peak traffic hours. The twenty-five dollar fee does not apply to any aircraft operating with a seating configuration of twenty-five or more passengers nor does it apply to certain aircraft operating on designated runways as helicopters or as air taxis. The plaintiff association, which appears to have some 145,000 members, and the individual plaintiffs and intervenors belong to a class styled General Aviation, an ill-defined class which has in common the fact that in the generality of instances their aircraft would have to pay the twenty-five dollar fee if they landed or took off at the three major New York area airports during the peak hours.

The Port Authority has now moved to dismiss the complaint and for summary judgment; the plaintiffs, who had earlier moved for an injunction and are now holding that motion in abeyance, oppose the Port Authority's motion both on the ground that there are factual issues to be determined in the case in any event and on the further ground that even on the genuinely uncontested facts the fee must be held to be illegal and its exaction must be enjoined. It is concluded that the case is one within the jurisdiction of the Court, that none of the counts is required to be dismissed on jurisdictional grounds, and that the defendants are entitled to summary judgment at this time.

I

The basic and perhaps controlling facts in the case are so well known publicly as almost to be a matter of judicial notice. The Port of New York Authority, which now operates the three major airports and Teterboro airport, was formed by interstate compact between New Jersey and New York, it is charged with carrying out the "Comprehensive Plan for Development of the Port of New York." See, as embodying the compact and implementing legislation, New York Unconsolidated Laws Sections 6401, et seq. and particularly Sections 6407, 6411, 6412, 6451, 6452 and 6631–6647 (the last sections referring to air terminals); and see as to gubernatorial veto power Sections 7151–7154. Under the air terminals portion of the present day compact it is "the policy of the two states to encourage the integration of such air terminals so far as practicable in a unified system"; the Port Authority is authorized to "maintain and operate air terminals" and "air terminals" is defined to mean facilities "necessary, convenient or desirable for the landing, taking off, accomodation and servicing of aircraft of all types, including * * * any * * * contrivance * * * used for the navigation of * * * air or space, operated by carriers * * *, or for the landing, taking off, accomodation and servicing of aircraft owned or operated by persons other than carriers"; the Port Authority "shall be regarded as performing an essential governmental function in undertaking the * * * maintenance or operation [of air terminals], and in carrying out the provisions of law relating thereto"; the Authority is authorized to apply directly to the proper federal officials "for federal loans or grants in aid of air terminals owned or operated by it"; with certain not presently material exceptions "all details of financing, construction, leasing, charges, rates, tolls, contracts and the operation of air terminals owned or controlled by the Port Authority shall be within its sole discretion and its deci-

sion in connection with any and all matters concerning such air terminals shall be controlling and conclusive." No action taken at any meeting of the Authority by any New York Commissioner has any effect until the Governor of New York has an opportunity to veto the same. The veto power must be exercised within ten days after the Governor receives the minutes of the action taken at the meeting; there is no pocket-veto; the action takes effect unless vetoed within the time limit. The gubernatorial veto nullifies the attempted action of the New York Commissioner or Commissioners involved. See New York Unconsolidated Laws Sections 6631, 6633, 6634, 6640, 6646 and 7151–7154.

The Authority operates John F. Kennedy International Aiport, LaGuardia Airport and Newark Airport, at which the twenty-five dollar fee is in effect, and it also operates Teterboro at which the charge is not in effect. The three major airports, Kennedy, LaGuardia and Newark, accommodate substantially all of the area's commercial airline traffic, and they have in the past handled General Aviation, including air taxis, and helicopters, on the same basis in terms of arrival and takeoff as the scheduled commercial airline passenger traffic. General Aviation accounts for a surprisingly large percentage of the "operations" (that is, landings and takeoffs) at the three major New York area airports. While there is the usual unaccountable failure of counsel to agree explicitly on the obviously relevant and little disputable figures, it appears without contradiction that in July 1968 16.6 percent of the "movements" at Kennedy were General Aviation, 11.7 percent being air taxi and 4.9 corporate and private; 32.1 percent of the movements at LaGuardia were General Aviation of which 8½ percent were air taxi and 23.6 percent corporate and private; and that 29.6 percent of the movements at Newark were General Aviation divided 14.3 percent to air taxi, and 15.3 percent corporate and private planes. Another set of figures used by the Property Administrator of the Federal Aviation Administration in an affidavit in another case indicates that in 1968 the General Aviation percentages were 14 percent at Kennedy, 29 percent at LaGuardia and 23 percent at Newark. Other figures, such as those included in Exhibit F of defendants answers to the interrogatories, indicate that in 1966 General Aviation accounted for 32 percent of total movements at the three major airports combined and that air taxi traffic, far the fastest growing segment of the growing General Aviation workload, came to about 44 percent of the General Aviation total. No doubt these figures are subject to endless qualification, but they acceptably indicate that the General Aviation traffic dealt with is substantial, and that the air taxi segment of it is a definable segment and one which has been singled out for differential treatment.

The affidavit of the Property Administrator in the other case also indicates, what is the subject of a very generalized notice, that in the fiscal year 1968 domestic and international carriers flew 106.5 billion passenger miles as against an estimated 3.7 billion passenger miles flown by General Aviation aircraft. The point of such a statistic is to emphasize that in general, and as the twenty-five passenger configuration limitation indicates, General Aviation uses smaller aircraft and quite possibly reflects a shorter average haul than the carriers. In result that would mean—and this is not debated —that the average carrier takeoff and landing will reflect the takeoff and landing of a very much larger number of passenger seats than will the average takeoff and landing of a General Aviation plane. How this would be affected by sub-classifying General Aviation between "all other" General Aviation and air taxis is surely speculative at this time. The general picture is plain: General Aviation is not insubstantial in volume, disregarding the air taxi traffic, that it does not, operation for operation, handle so many passengers on average as do the carriers, and that until August 1, 1968, as a practical matter it had the same ac-

cess, on a first-come, first-served basis to the facilities of major airports that the common carriers by air enjoyed.

Effective August 1, 1968, the Authority, for the professed purpose of relieving congestion and achieving maximum efficient operation at the three major airports, and with the professed intention of influencing General Aviation operators to transfer their operations where possible away from the runways and traffic control patterns at the three major airports during peak traffic periods, adopted a twenty-five dollar minimum charge to be put into effect during defined peak operating periods in lieu of the pre-existing five dollar minimum fee. The peak hours were defined as from 8 A.M. until 10 A.M. on Monday through Friday and from 3 P.M. until 8 P.M. on all seven days of the week. The fee applied in terms of twenty-five dollars per takeoff but it applied to any aircraft which either took off or landed during the peak hours and which had a seating configuration of less than twenty-five passengers. As originally adopted there were two exceptions: first, all helicopters were excluded and, second, air taxis operating pursuant to Authority permits, and permits were to be issued to air taxi operators conducting regular service for airline connecting passengers at Kennedy provided their aircraft operated at Kennedy from runways not used by the scheduled airlines. On September 5, 1968, the Authority approved its executive director's having waived the twenty-five dollar fee on FAA authorized "STOL" aircraft using the 1,100 foot LaGuardia runway 1–19 (a use taking place under VFR conditions and under air traffic control patterns and procedures independent of those for the runways used by the scheduled airlines), and authorized the executive director to revise the schedule of charges on air tax operators at Newark when their aircraft operated from runways not being used by the scheduled airlines provided the air taxis were conducting regular service for airline connecting passengers at Newark airport. On December

5, 1968, the Authority authorized the executive director to agree with the helicopter company, which had substituted fixed wing "STOL" aircraft for its helicopter service in some two-thirds of its flights, that the fixed wing operations would not be subject to the twenty-five dollar minimum fee at Kennedy or Newark if conducted on runways not being used by other scheduled airlines. On March 9, 1969, the executive director was authorized by the Authority again to revise the schedule of charges so that at LaGuardia both New York Airways for its fixed wing operations and air taxis generally would not be subject to the minimum charge for operations on runway 32 at LaGuardia if conducted pursuant to Port Authority permits issued to them on the basis that they were operating regular service for airline connecting passengers at LaGuardia. The resolution was based on a report that such operations on runway 32 at La Guardia would demonstrably not interfere with operations of the scheduled airlines. Finally on June 12, 1969, and in view of the newly effective Federal Aviation Administration "High Density Traffic Airports" regulations, the Authority authorized the executive director to modify the definition of the peak hours during which the twenty-five dollar minimum fee would be exacted in the light of any scheduling changes that flowed from alterations in peak traffic conditions in consequence of the adoption of the new FAA regulations.

The twenty-five dollar minimum fee openly and designedly "favored" the large plane landings and takeoffs during peak hours at the expense of small plane operations, and, in the small plane classification, it singled out for favored treatment air taxis, and particularly those conducting a connecting service to the airlines.

Meanwhile and pursuant to APA rulemaking procedures (see 33 F.R. 12,580 and 33 F.R. 17,896) the Federal Aviation Administration gave notice of proposed amendments to Part 93 of the Aeronau-

tical and Space regulations and adopted the so-called "High Density Traffic Airports" regulations of 14 C.F.R. §§ 93.121, *et seq.* (Subpart K). The regulations designated Kennedy, LaGuardia, Newark, O'Hare (Chicago) and Washington National airports as "High Density Traffic Airports." The regulations, Section 93.123(a) limited, and allocated among classes of users, the hourly number of IFR operations (take-offs and landings) that could be reserved at the specified airports per hour. So far as the Authority's airports were concerned the limiting and allocating IFR operations schedule is as follows:

| USER | KENNEDY | LA GUARDIA | NEWARK |
| --- | --- | --- | --- |
| Air Carriers except air taxis | 70* | 48 | 40 |
| Scheduled air taxis | 5 | 6 | 10 |
| Other | 5 | 6 | 10 |

*Except 5:00 to 8:00 P.M.

The allocations of reservations did not apply from midnight to 6 A.M. local time but the total hourly limitation remained applicable throughout the twenty-four hour day. At Kennedy from 5 P.M. to 8 P.M. local time the total of 80 reservations were allocated to air carriers other than air taxis. Under Section 93.123 (b) in any hour unused reservations of one user class were reallocated to the next lower class; that is, unused carrier ones went to scheduled air taxis, and those unused by scheduled air taxis went to the "other" classification.

The numerical allocation applied only to IFR reservations. (The letters "IFR" refer to Instrument Flight Rules, and the mated expression VFR signifies Visual Flight Rules and relates to operations conducted when the ceiling reported at the airport is at least a thousand feet and the reported ground visibility at least three miles.) Under 14 C.F.R. § 93.125, it is provided that unless otherwise authorized by Air Traffic Control in a letter of agreement executed pursuant to another section of the regulations, no one may operate an aircraft to or from a high density traffic airport unless he has both received an arrival or departure reservation from Air Traffic Control and has filed an IFR or VFR flight plan for that operation. Additional operations take place, as provided in § 93.129 under both IFR and VFR without reference to the maximum IFR limitation if the operator has obtained a departure or arrival reservation from Air Traffic Control. Such a reservation is granted by Air Traffic Control when the aircraft may be accommodated without significant additional delay to the operations allocated for the airport for which the reservation is requested and, in the case of operation under VFR, provided VFR conditions prevail. Operations under letter agreements (*cf.* Section 93.-129(c)) relate to the situation in which the aircraft is operated without interference to any other aircraft operation, but the prerequisite to such operation is a letter of agreement between the airport management, the operator and the appropriate Air Traffic Control facility.

The High Density Traffic Airports regulations were adopted with knowledge that the twenty-five dollar fee arrangement prevailed at the three New York area airports. Their adoption was opposed, modifications were suggested and some were made before adoption. The FAA said explicitly, in its action promulgating the new regulations, that they were intended to provide relief from ex-

cessive delays at certain major terminals and not to correct a safety problem, were intended to deal with the congestion problem and with the problem of Air Traffic Controller workload, and that the letter agreement regulations had in mind the helicopter and the STOL and VTOL operations that might be authorized at particular airports to the extent conducted on non-interfering runways. The prefatory statement of the FAA referred to the Port of New York Authority higher fee schedules adopted effective August 1, 1968, and characterized them as having been adopted for the express purpose of shifting general aviation traffic away from peak hours. The FAA considered that in the three months since the fees were imposed General Aviation operations at the three New York airports had declined by more than twenty-five percent and remarked that, while other factors might account for part of the decline, much of it was doubtless attributable to the fee increase. The FAA added that since the fee schedule was the subject of litigation its long run effect was uncertain. It noted that at September 11, 1968, the FAA itself had imposed an increased minimum charge for landing at Washington National Airport as set forth at 33 F.R. 12833. Noting this and other programs of various kinds put into effect to relieve congestion, the FAA nevertheless considered it obvious that congestion would again reach serious proportions unless additional restraints were placed on aircraft demand for the use of airport facilities. It said that no short-term solutions offered any substantial relief and observed that for the fiscal years ending October 1966, 1967 and 1968 respectively *air carrier* operations at the three New York airports combined has increased from 618,297 to 670,179 and then to 715,846 with more airplanes being delivered daily to initiate new airport load. The FAA, *after saying* that additional legislation for the expansion of airport facilities was required, continued (33 F.R. 17,897):

"In the meantime, the public interest in efficient, convenient, and economical air transportation requires more effective use of airport and air space capacity. The authority of the FAA to regulate aircraft operations to reduce congestion is clear. The plenary authority conferred by the Federal Aviation Act to regulate the flight of aircraft to assure the safe and efficient utilization of the navigable air space is well established by practice and judicial decision. As indicated in Notice 68–20, it is anticipated that, subject to the approval of the Civil Aeronautics Board, the air carriers can arrive voluntarily at decisions to reduce schedules so as not to exceed the total allocation established by this rule in the interest of efficient air space utilization * * * this rule as presently drawn contemplates that an agreement will be in force on the effective date of the rule, April 27, 1969.

\* \* \* \* \* \*

"This rule grants a greater priority to certificated air carriers, who provide common carrier service in accordance with the policy of recognizing a national interest in maintaining a public mass air transportation system, offering service on equal terms to all who would travel. For the traveler today, there is frequently no feasible alternative mode of travel. The concept of 'first come—first served' remains as the fundamental policy governing the use of air space so long as capacity is adequate to meet the demands of all users without unreasonable delay or inconvenience. When capacity limitations compel a choice, however, the public service offered by the common carrier must be preferred. This policy is fully consistent with the Federal Aviation Act's provisions relating to the certification of common carriers by the Civil Aeronautics Board, wherein the Board finds that the service provided is required by the public convenience and necessity."

II

The core of plaintiffs' attack on the fee is that the fee cannot either relieve

the landing and take-off congestion in terms of number of operations nor—and this is admitted—contribute anything to safety. The argument then is that the fee is openly discriminatory and as such flies in the teeth of the law. It is noted that nowhere does the law authorize a discrimination in favor of air carriers. Explicitly and repeatedly, it is argued, the laws indicate the equality of right of access to air facilities—whether navigable air space or airports—as between quasi-public carriers and private operators. Thus the most basic of all the federal provisions, 49 U.S.C. § 1304 enacts that, "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable air space of the United States." The navigable air space, under § 1301(24), means air space above the minimum altitudes of flight prescribed by regulations issued under the law and includes "air space needed to insure safety in take-off and landing of aircraft"; under § 1301(22), "landing area" means any locality either on land or water, including airports, used or intended to be used for the landing and taking off of aircraft whether or not facilities are provided for shelter, servicing, repair or passengers. 49 U.S.C. § 1348(a) authorizes and directs the Administrator of the Federal Aviation Administration to develop plans for and formulate policy with respect to the use of the navigable air space and to assign by rule or regulation or order the use of the navigable air space under such terms, conditions and limitations as he deems necessary in order to assure "the safety of aircraft and the efficient utilization of such air space." The Administrator is authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft for the navigation, protection and identification of aircraft, for the protection of persons and property on the ground, and "for the efficient utilization of the navigable air space, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and air borne objects." Under 49 U.S.C. § 1349(a) no federal funds may be expended for the maintenance or operation of any landing area or any air navigation facility except upon the written recommendation and certification of the Administrator that such landing area or facility is reasonably necessary for use in air commerce or in the interest of national defense; any interested person may apply to the Administrator for such a recommendation and certification with respect to any landing area or air navigation facility proposed to be established, maintained or operated by or in the interest of any such person but, "There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." Under the Public Airport Development Act it is provided, 49 U.S.C. § 1110, that as a condition precedent to approval of an airport project, the Administrator

"* * * shall receive assurances in writing satisfactory to him that—

(1) the airport to which the project relates will be available for public use on fair and reasonable terms and without unjust discrimination; * * *.

(8) the airport operator or owner will submit to the Administrator such annual or special airport financial and operations reports as the Administrator may reasonably request."

The Port of New York Authority has received over $48,000,000 of federal grants, over $17,000,000 applicable to La Guardia, over $16,000,000 to Kennedy and over $13,000,000 to Newark. In connection with these projects it has again and again, and with respect to each airport, executed the sponsor's assurances required by the statute including the assurance

"2. The Sponsor will operate the Airport as such for the use and benefit of the public. In furtherance of this covenant (but without limiting its general applicability and effect), the Sponsor specifically agrees that it will

keep the Airport open to all types, kinds, and classes of aeronautical use without discrimination between such types, kinds, and classes: Provided, That the Sponsor may establish such fair, equal, and not unjustly discriminatory condition to be met by all users of the Airport as may be necessary for the safe and efficient operation of the Airport; And Provided Further, That the Sponsor may prohibit or limit any given type, kind, or class of aeronautical use of the Airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public."

While as indicated the core of plaintiff's challenge is the charge of discrimination in favor of commercial airline traffic and against General Aviation without having either the basic right to classify or any justification for the classification instituted, the claim is elaborated in some detail. Since, concededly, the fee classification has not been put forward as a safety measure and is not claimed to be justifiable on that ground, plaintiffs point out that the sole justification for the regulation is congestion, and that the remedy chosen is to deter the use of the airport by General Aviation particularly during the peak hours and to divert General Aviation to Teterboro. Plaintiffs contend that—as all must agree—congestion is principally the consequence of commercial airline traffic, of mass transit, and yet nothing now done, plaintiffs contend, purports to deal realistically or adequately with the problem of airline scheduling. Moreover, it is argued, one class of General Aviation is manifestly preferred and that is the helicopter and air taxi services, which, under the regulations, will continue to burgeon while the airline-connecting service that General Aviation also renders is discriminated against. Moreover, it is contended, there is no available reasonable alternative airport facility because Teterboro is now radically overcrowded, and it is undergoing additional construction work at the present time

that contracts its already inadequate facilities further and will continue to do so until the construction is complete. In addition it is stated, and it is separately argued by the *amicus curiae*, that the power of the FAA to regulate and control air traffic and the extent of its present regulation of that traffic, particularly at the New York area, invalidates, on the preemption doctrine, the present attempt of the Authority further to regulate charges at the airport for the sole and only purpose of controlling traffic patterns.

The defendant contends that the new fee schedule is not in conflict with any provision of federal law or any undertaking of the Authority in connection with its receipt of federal grants of funds for airport improvement, and that its fee schedule is reasonable and appropriate. Arguing that there is no possibility of preemption and that there is at least qualified FAA approval of the fee schedule, defendant cites the decision of Judge Gesell in the District of Columbia in Aircraft Owners & Pilots Assn. v. Volpe, Civil Action No. 927–69, rendered orally on May 14, 1969, in which summary judgment was granted to the defendant Secretary of Transportation. The action sought to invalidate the High Density Traffic Airports regulation as adopted effective June 1, 1969, because of its distribution of IFR hourly operation reservation rights among the three types of aircraft operation and, more particularly, because of 14 C.F.R. § 93.123(b) and § 93.129, under which the reservation system operated in such manner that the third class (of "other" users), which embraces General Aviation other than air taxis, is deferred to "air carriers other than taxi" and to "scheduled air taxis" in the allocation of reservations. Judge Gesell there held that there could be no injunction against putting the regulation into effect and that the Secretary was entitled to summary judgment. The Court found that there was a rational basis for the rule adopted, that such a rule was within the regulatory authority delegat-

ed to the Administrator and that the Administrator had adopted the rule in a competent, deliberate and intelligent manner after having properly pursued the rule making procedures provided by the Administrative Procedure Act. The Court noted, what is generally regarded as roughly true, that IFR conditions prevail only about 15% of the time and that the regulation, adopted in the service of a dominant public interest in dealing with a critically serious congestion problem, was temporary in terms, scheduled, as it is, to expire December 31, 1969. The Court was satisfied of the correctness of the allegation that the scheduled air carriers were advantaged as against the General Aviation operators "under bad weather conditions," and that the aircraft operators represented by plaintiffs would experience inconvenience and a necessity for a considerable business readjustment, including a possible shift to other airports; the Court nevertheless considered that a preliminary injunction would not in any case have been appropriate, visualizing the matter in terms of a balancing of the equities and evaluating probabilities of ultimate success.

Defendant argues also that the complaint should in any case be dismissed because plaintiffs have no standing to sue, and they contend further that federal jurisdiction, if it exists as to the first cause of action, does not exist as to any of the others.

### III

1. To deal first with the question of federal jurisdiction: the separation of the case into different causes of action is fundamentally unreal; as plaintiffs say, the second and the other causes of action really assign additional theories or arguments for relief, and do not put forward markedly distinct grounds of action. Thus, Count 2 emphasizes the argument that the Authority's action can be visualized, as plaintiffs' see it, as burdening interstate commerce in a prohibited manner, especially since the federal government has undertaken to regulate national airport development, and since,

too, the defendant as a bi-state agency, even though it acts under a federal compact, may not proceed inconsistently with federal regulations. Count 3 argues that the Authority's action can be visualized as violative of the Fourteenth Amendment because it is arbitrary, unreasonable and capricious in its distinction between classes of aeronautical use. Counts 4 and 5 emphasize the argument that the new fee schedule will in practical effect and in announced intention limit the three major airports to the service of common carriers by air and thus constitute a breach of the obligation of the Authority under the Comprehensive Plan, embodied in the bi-state statutes, to serve all classes of aircraft without discrimination and without the imposition of excessive charges.

█ It appears to be conceded that the first cause of action properly invokes the federal jurisdiction without reference to the presence or absence of jurisdictional amount. Jurisdiction can in fact safely be placed on 28 U.S.C. § 1337 providing a federal jurisdiction in actions under any Act of Congress regulating commerce. Plaintiffs both rely on Sections of the Public Airport Development Act and the Federal Aviation Act which they say affirmatively confer rights upon them, and they rely upon the existence of the comprehensive scheme of the FAA regulations to show the invalidity of the defendant's effort to regulate, and to regulate in an incompatible way, the traffic regulation of which is wholly committed to the FAA by federal law. See Fitzgerald v. Pan American World Airways, 2d Cir. 1956, 229 F.2d 499; Town of East Haven v. Eastern Airlines, D.Conn.1968, 282 F.Supp. 507, 513; cf. Murphy v. Colonial Federal Savings & Loan Assn., 2d Cir. 1967, 388 F.2d 609, 614–615; Bloomfield Steamship Co. v. Sabine Pilots Assn., 5th Cir. 1959, 262 F.2d 345, 346–347; Adams v. International Brotherhood, etc., 10th Cir. 1958, 262 F.2d 835, 839. Compare Ex parte Lennon, 1897, 166 U.S. 548, 553–554, 17 S.Ct. 658, 41 L. Ed. 1110. It is not necessary to consider

whether, if each of the other grounds of right put forward were the sole ground on which the action were based, the federal courts would have jurisdiction; they have been put forward only in an action in which the dominant claim is one of denial of federal rights; the other "claims" rely on the same facts, and only the same facts, that are primarily asserted to reflect a violation of federal laws which are regulations of interstate and foreign commerce. Hence to the extent that they are separate causes of action in any degree, they are within the jurisdiction of the court under the pendent jurisdiction doctrine as today understood. United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 721–728, 86 S.Ct. 1130, 16 L.Ed.2d 218; Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; cf. Siler v. Louisville & N. R. R., 213 U.S. 175, 191–192, 29 S.Ct. 451, 53 L.Ed. 753.

■ 2. The question of the standing of plaintiffs to sue is challenged largely on the authority of Port of New York Authority v. Eastern Airlines, E.D.N.Y. 1966, 259 F.Supp. 745. See also City and County of San Francisco v. Western Airlines, 1962, 204 Cal.App.2d 105, 22 Cal. Rptr. 216. The *Eastern Airlines* case was put on the very narrow ground that, *Eastern* having sued explicitly as a third party beneficiary of the Grant Agreements between the Authority and the government, it had failed to show that it came within third party beneficiary contract thinking, the Court adding, as it passed on, the point that nothing in the Airport Act or the Grant Agreements indicated an intention to abridge the Authority's right to regulate the airports and the Airport Act gave the tenant airlines no right to enforce Grant Agreements. Whatever may be the special standing of the Association in the present case (*cf.* Scenic Hudson Preservation Conference v. F. P. C., 2d Cir. 1965, 354 F.2d 608), the individual plaintiffs and the individual intervenors as owners or pilots would have to pay the fee exaction, and if it is forbidden by law it would

plainly be as to them an illegal exaction. That they have no standing to complain of such a specific, identifiable and plain wrong would be remarkable indeed, and plainly at variance with the generally acknowledged idea that " * * * violation of a legislative standard gives those intended to be protected a private right of action provided the injury sustained is other than that suffered by the public generally." Hooper v. Mountain States Securities Corp., 5th Cir. 1960, 282 F.2d 195, 201–202. So here, the individual plaintiffs and individual intervenors are persons individually aggrieved, persons whose individual rights of free access to the federal airways and navigable air space to the airports have been abridged, and, in the absence of something in the statutes to indicate that some other person or public officer is affirmatively vested with a positive responsibility to vindicate such grievances, the conclusion is inevitable that the individual aircraft owners must be able to vindicate their own individual rights. See Fitzgerald v. Pan American Airways, *supra*, 229 F.2d at page 502; Roosevelt Field v. Town of North Hempstead, E.D.N.Y.1949, 84 F. Supp. 456, 459–460. Compare J. I. Case Co. v. Borak, 1964, 377 U.S. 426, 433–434, 84 S.Ct. 1555, 12 L.Ed.2d 423; Bell v. Hood, 1946, 327 U.S. 678, 683–684, 66 S. Ct. 773, 90 L.Ed. 939.

3. It is argued by the *amicus curiae*, and stated by plaintiffs, that the FAA is invested with so pervasive an authority to regulate and control air traffic (49 U.S.C. §§ 1346, 1347, 1348, 1353, 1354; and see 49 U.S.C. §§ 1102, 1108 and 1110) that room is not left for such manifestly regulatory activities as those which the Authority has assumed to itself in adopting the revised schedule of takeoff fees.

■ Unquestionably broad as are the powers of the Administrator with respect to the regulation of air traffic, it is evident in this and in other contexts that the Administrator has not so pervasively regulated the movement of aircraft that he has excluded the existence of areas of proper airport regulation.

Direct conflict between federal regulation and local law of course results in the invalidation of the local provision. American Airlines, Inc. v. Town of Hempstead, 2d Cir. 1968, 398 F.2d 369. However, as Port of New York Authority v. Eastern Airlines, Inc., *supra*, 259 F.Supp. at 752–753, makes plain, there is room for the operation of Port Authority Regulations which have the effect of curtailing activities not forbidden by federal regulation, and, indeed, contemplated as specifically permissible by federal regulation, in the absence of other competent prohibition.

■ In the present case, it is correct to say that the FAA cannot be found expressly to have approved the Authority's revised schedule of take-off fees. But it is evident that the FAA adopted and made effective the High Density Traffic Airports regulations in specific contemplation of the continued existence of the Authority's new fee schedule, and treated the new fee schedule as an at least temporarily alleviating procedure in effect at one of the congested airports with which the FAA regulations were to deal. The present Authority fee schedule, if considered to be a restrictive traffic regulation, is one that restricts traffic in and out of the airports within an area left unrestricted by the partially restricting high denstiy regulation. Nothing in the present fee schedule runs counter to the FAA regulation in the sense that it seeks to authorize conduct which the federal regulation prohibits or requires the cessation of a practice required by federal regulation. United in general purpose with the high density regulation, the revised fee schedule, if viewed as a regulation of air traffic, simply has the tendency further to restrict the traffic restricted by the federal regulation, but to do so in a direction of restriction and for an aim common to both sets of regulations.

■ 4. The plaintiffs' contention that the revised fee schedule is substantively invalid is without substance. It may fairly be concluded that while 49 U.S.C. § 1110 takes the form of requiring the Administrator to exact certain contractual conditions as a condition precedent to his approving an airport project, the actual covenant is unimportant; it is the statute that enacts the right and obligation. Such an airport complex as that operated by the Authority, to which the Government has made repeated grants is, as a matter of affirmative federal law, "available for public use on fair and reasonable terms and without unjust discrimination." Any departure from that substantive statutory obligation would be illegal conduct remediable at the suit of a person suffering individual injury from it. No other purpose for that enactment can be found or fancied. Even within the narrow interpretation of Section 1349(a) suggested by the legislative history, that is, that the type of "exclusive" right there forbidden is one of the sort noxious to the anti-trust laws, the section can hardly be narrowly confined to instances of manifest violation of the anti-trust laws, and the present context is not so remote from the class of competitive restraints as to be outside the thrust of the section even so interpreted. Nor is it proper to ignore the more general provisions of the Federal Aviation Act, which declare the public right of freedom of transit through the navigable air space and imply the right of access to landing areas, delineate the scope of federal regulation of uses of air space, and define generally applicable standards for air safety and the efficient utilization of navigable air space. The Authority's statutory or compact powers must operate within the scheme of the Federal Aviation Act and of the Airport Act. The provisions of the State Acts, while in some respects more explicit in their reference to private aircraft and in distinguishing persons other than carriers from air carriers, add nothing of substantive significance to what flows from the public nature of a public airport owned by a public authority and devoted to the performance of the functions of an airport or air terminal fitted into the national airport system. 49 U.S.C. §

1102. See 49 U.S.C. § 1101(a) (2), (7), (8); §§ 1349, 1350.

■ While, therefore, any action of the Authority which is regulatory in terms or in effect must find a source of authority either in the Port Authority's ownership of its property or in the law that created the Authority, and must be consistent with federal law, the Authority's acts nevertheless remain public acts required to conform primarily to the standards of public law action.

As owner of the lease of the airport facilities involved and as airport operator, the Authority can establish schedules of charges and has long done so; that general authority is unchallenged. The present challenge narrows, in the absence of direct conflict with existing FAA regulations, to a claim of inherent illegality on the ultimate grounds *first,* that there is a total want of any authority to distinguish among aircraft from the point of view of their right of access to these public airport runways for landing and taking off, and, *second,* that even if there is a power to distinguish between mass transportation (such as that of the common carriers by air) and private aviation, or General Aviation, the present classification is invidiously discriminatory against that part of General Aviation typified by the non-carrier aircraft owner other than an air taxi.

■ *First,* no genuine basis appears for denying the FAA and airport owners the power to differentiate among kinds of flights. A traffic tower must accord an on-the-spot preference to an aircraft requesting preferred landing time where safety depends on getting a prompt clearance to land. Safety would inevitably require, too, that in the long term an airport be prepared to cope with exigent safety situations presented by different types of aircraft under different conditions of approach. If it be true that all persons have equal rights of access to the navigable air space, then it is not undifferentiated aircraft by count that must be treated equally in landing approach and take-off. One aircraft approach may represent the right of over 150 passengers to have access to the navigable airways and landing areas. The next plane may represent the right of one or of two persons to have access to the airways and landing areas. To treat them alike in allocating scarce landing and take-off time and space is to ignore and not to recognize the basic right of equal access to airways and landing areas. To treat the aircraft approach as the controlling consideration, which is the heart of the plaintiffs' contentions, would be to reduce everything to the safety considerations and to a blind application of the first-come, first-served principle. If "first-come, first-served" has validity as a principle, it would necessarily have to be limited by the inevitable qualification, "all other things being equal," which they rarely are. Considerations of safety and of efficient utilization of the air space are both valid grounds upon which to establish preferential assignments of landing and take-off times, and are perfectly compatible with the interest of every person in the protection of his freedom of access to navigable airways and related landing areas. This is true whether the distribution of preferentials is made on the spot, or by advance classification through regulations which have as their object the attainment of efficient utilization of the air space or air safety, or both.

*Second,* it cannot be said that the particular preferential system set up by the fee schedule is arbitrary, capricious, unreasonable or invidiously discriminatory. The test is not whether it is the wisest and best allocation of a scarce commodity that could have been made, and many would doubtless feel repelled by a plan of allocation under which the considerations that justify allocation yield to the presence of a willingness and ability to pay for an objectively unwarranted share in the commodity. Yet in the context of the present case it is fair to recognize that the willingness and ability to pay the increased charge may itself be, however crass, an efficient means of locating an indefinable sub-classification of

enhanced social utility in some kinds of General Aviation that is not related to the passenger-carrying size of the aircraft.

 It is not contended that the twenty-five dollar charge could not be justified on some economic basis, if not on a cost-of-service basis, but simply that because it is not exacted from all, it is *prima facie* invidiously discriminatory. The only possible answer is that the fee is not charged in the expectation or hope that it will be collected, but rather to induce the aircraft affected to use other times of the day or other facilities for their operations. Given the unquestioned fact of airport congestion at the three airports, the revised fee schedule draws a perfectly rational line in separating mass transportation and its ancillaries from other aviation. The efficient utilization of air space in the interest of the greatest number of users of the air space plainly justifies the first distinction between large and small aircraft, and, while the drawing of the line at exactly a twenty-five passenger capacity plane is not explained, no criticism is made of the choice of that number. The narrowly restricted exemption of air taxis that in effect operate as connecting carriers and do not use interfering runways is justified by the evident immediateness of connection with the dominant, mass-transportation concern of the air terminals. It appears not to be denied that the fee has operated to divert traffic from the three major airports, or, at least, to diminish the General Aviation traffic at those airports. That there has not been a total diversion out of the peak hours of such traffic would appear to reflect the existence of General Aviation traffic willing and able to pay the charge. The charge, its efficacy and fairness continues under the review both of the Authority and of the FAA which, as indicated, has not given the charges its unreserved approval.

5. Defendants contend that there are no issues of fact requiring a trial because the facts as to which the parties are not in substantial disagreement are dispositive of the entire case. Plaintiffs contend that there are issues of fact that must be determined.

*First*, that the FAA has not expressly approved the fee schedule nor determined its compatibility with the Airport Act and the grant-in-aid agreements. Affirmative FAA approval of the schedule of fees is not a requirement of law. Enough appears to make it plain that there is no inherent incompatibility, and that the FAA is provisionally prepared to regard the schedule of fees as compatible in operation with its own provisions in the same congestion context. Evidently the FAA proceeds on the basis that the Authority action is cooperative action. See 49 U.S.C. § 1343(i).

 *Second*, that Teterboro is not a reasonably convenient nor adequate facility as an alternate to the three major New York airports. It must be taken on the present record, if defendants are to be accorded summary judgment, that transfer of General Aviation traffic to Teterboro would impose inconveniences and might in some instances result in an absolute loss of general aviation traffic or its practical exclusion from all Port of New York Authority air terminal facilities. The fee schedule, however, while expected to influence a transfer of General Aviation operations to Teterboro, does not exclude any General Aviation aircraft from the three major airports either during off-peak hours or even during peak hours. Granted, for the present purpose, that the revised fee could in practical effect deprive General Aviation altogether of traffic that cannot afford the fee but must utilize one of the three major airports at the critical periods, the fee schedule is nevertheless valid as a reasonable, if not ideal, method of effecting the most efficient utilization of the air space and the air time involved.

It may be assumed for present purposes that the General Aviation involved is not pleasure flying at the three major airports but (apart from air taxi movements) is related to airline connections or is business and similar flying for which close proximity to final destination is an

obvious desideratum. It may be assumed, therefore, for present purposes, that only a minor part of the General Aviation could find Teterboro as convenient to use as the three major airports. But these are factors well known to the Port Authority, as its own records show, and matters which as a matter of public judgment it subordinated to the extent of the fee to the mass tranportation interest. To do so was not irrational or arbitrary but a reasonable exercise of a managerial judgment that was well within the competency of the Authority.

Moreover, while using Teterboro may involve inconveniences, it is not a nil facility or a purgatorial alternative. It is comparatively less convenient for flights that would better serve their business purpose by landing at one of the three major airports and, in an indefinite number of instances, that difference in convenience may induce a prospective passenger or group to forego the option of a General Aviation flight into the Metropolitan Area. That, however, reflects the shortage of local airport facilities, and is not an argument for limiting the effort to ameliorate the congestion to a reliance on the new FAA High Traffic Density Airports regulations.

 *Third,* in a variety of forms plaintiffs assert that the fees schedule and any consequent diversion of traffic to off-peak hours and to Teterboro is ineffective genuinely to remedy the airport situation which, they contend, is due to the over-scheduling of flights by the commercial airlines, particularly in the peak hours, and the widely publicized problems created by the traffic controllers' actions.

It may be assumed that the intensity of air congestion is largely due to the growth in air transportation and specifically to the growth in air carrier transportation. Indeed, it is the concentration of the growth in air traffic in the hands of the certificated carriers that accounts for and is argued to justify not only the preference indirectly accorded to them by the fee schedule at the New York airports but also by the High Den-

sity Airports regulations. The reason is not far to see. The certificated air carriers are, in general, common carriers operating under certificates of public convenience and necessity and they are required by law to provide adequate and safe service and facilities in connection with the transportation that they are certificated to conduct; once certificated, they can be required, in consequence of adequacy-of-service investigations, to increase or supplement their existing services. Cf. National Airlines, Inc. v. CAB, 1962, 12 U.S.App.D.C. 119, 300 F.2d 711. Considerations of economic feasibility, rooted in the service demands of the travelling public, inevitably shape aircraft scheduling and it is little if at all related to unilateral acts of will on the part of each air carrier. Similar considerations, though not related to certificate responsibilities, certainly affect General Aviation as well. The overall congestion that is the aggregate consequence is not the fault or responsibility of either class of carrier but is a ruling condition of all aircraft operations, due primarily to the insufficiency of airport facilities in the area, which imposes a rationing of landing and take-off times at peak hours. A preferential system such as that of the High Density Traffic Airports regulations and the New York Airports Fee Schedule is inevitable, for once rationing was necessary, a failure to distinguish among flights in terms of their relation to the public convenience and necessity was unthinkable. But in any contest that had to be resolved in terms of the public convenience and necessity, a resolution in favor of the mass transportation carriers as against general aviation was the dictate of simple reason. No doubt the moment by moment, flight by flight congestion in terms of handling aircraft off runways and to runways is not altered materially by any such classification of traffic, but the scope of public service for each hour of peak hour service is materially expanded. That consideration was entitled to primacy in the thinking of the FAA and in that of the Authority.

*Fourth,* it is argued that even a fairly successful diversion of a large part of general aviation to Teterboro and other regional airports will not create any increase in Metropolitan Area IFR capacity and will not resolve the disparity between demand and capacity at Kennedy, LaGuardia and Newark. But, again, the capacity of the three major airports to deal with the traffic tendered to them whether under IFR or VFR conditions is overtaxed during peak hours and the new regulations and fee schedule will ameliorate the condition not by increasing the number of landings or take-offs handled during the peak hours but in terms of increasing the number of arriving and departing passengers handled during those peak hours. It is not of course that General Aviation is not in the public interest. The relevant present consideration is that in any contest of rationing with mass transportation it must in reason and in right yield the right of way to mass transportation if, as is the case, not all demands for service can be met.

*Sixth,* it is argued that there is a factual issue to be resolved in the record indications that the fee schedule was if not first presented by airlines, pressed by the airlines, and was connected in the discussions between the airlines and the Authority with the idea of the airlines' subsidizing ground transportation from Teterboro to the city that would afford General Aviation an additional incentive to transfer operations to Teterboro. Assuming for the present purpose that the Authority worked out the fee schedule very largely in consultation with the airlines, that the matter of subsidizing ground transportation to Teterboro by the airlines was injected into, kept in and influenced the trend of the discussions, and that, while others participated in the discussions, the principal participants in the discussions were the major airlines and the Authority, that does not indicate that impropriety attended either the conduct or outcome of the discussions. The carriers are the principal users of the major airports and the principal servants of the traveling public that largely depends on the scheduled carriers. The airport is a public one, the Authority a public body and it is both inevitable from the manifold nature and the importance to both sides of the relations between the Authority and the major carriers that the air carriers and the Authority are in constant discussion on many subjects, and not least on the subject of airport congestion and delay. But whether or not the result was insufficient discussion between the Authority and General Aviation representatives it could not be made more clear by exploring the facts that the new fee schedule exhibits a patent and intended air carrier bias. That the preference of mass transportation coincided with the expressed wishes of the air carriers becomes unimportant if the preference itself is warranted and inevitable, as it is. It reflects the underlying traffic realities and in this case coincided with the public interest.

Since the issues of fact suggested could not if tried result in the production of evidence of controlling significance, the defendants are entitled to summary judgment.

It is accordingly

Ordered that the motion of the defendants for summary judgment on Count One is granted, the motion to dismiss the remaining counts of the action on the ground of a want of jurisdiction is denied, and, there being no facts relevant to the other Counts, so far as they are separate counts, which are in substantial dispute, the motion for summary judgment is granted as to the entire case, and the Clerk is directed to enter judgment that plaintiffs take nothing and that the action is dismissed upon the merits with costs.