**ARAPAHOE COUNTY PUBLIC AIRPORT AUTHORITY, a political subdivision of the State of Colorado, Plaintiff–Appellee,**

v.

**CENTENNIAL EXPRESS AIRLINES, INC., a Colorado corporation and Golden Eagle Charters, Inc., d/b/a Centennial Express Airways, Inc., a Colorado corporation, Defendants–Appellants.**

No. 95CA0307.

Colorado Court of Appeals, Div. I.

Dec. 12, 1996.

Rehearing Denied Jan. 16, 1997.

Certiorari Granted Aug. 18, 1997.

Brega & Winters, P.C., Ronald S. Loser, Brian A. Magoon, Peter A. Gergely, Denver, for Plaintiff–Appellee.

Bench Pottinger & Van Nest, LLC, Mark A. Pottinger, Nancy L. Van Nest, Denver, for Defendants–Appellants.

Opinion by Judge METZGER.

Defendants, Centennial Express Airlines, Inc., and its wholly owned subsidiary, Golden Eagle Charters, Inc., d/b/a Centennial Express Airways, Inc. (Golden Eagle), appeal the permanent injunction entered in favor of

plaintiff, Arapahoe County Public Airport Authority (the Authority), prohibiting defendants from conducting scheduled passenger flight service to or from Centennial Airport (the Airport). We reverse.

The Airport is located in Douglas and Arapahoe Counties, approximately five miles southeast of Denver, and was founded in 1967 as a general aviation airport. It was not designed to include a terminal, baggage facilities, or other appurtenances associated with commercial passenger air transport.

Since its inception, the Airport has seen a substantial increase in aviation traffic, so that in 1988, it was ranked as the 28th busiest airport in the United States. Projections for future growth indicate that traffic levels at the Airport will continue to increase.

As a result of voluntary coordinated regional planning with other governmental organizations in the Denver area, the Airport has been a reliever air terminal, used primarily for general aviation and not for commercial passenger traffic.

In 1975, Arapahoe County established the Authority pursuant to § 41–3–101, et seq., C.R.S. (1993 Repl.Vol. 17); as such, the Authority is a political subdivision of the State of Colorado. *See* § 41–3–102, C.R.S. (1993 Repl.Vol. 17). The Authority owns the land and the facilities at the Airport except for two runways which it leases from the county. As the proprietor of the Airport, the Authority has the power to promulgate and enforce regulations relating to Airport activities, subject to federal and state regulation. These regulations have the force and effect of law.

In order to finance its rapid growth, the Airport has accepted over $20 million in federal grants since its opening. As a condition of these federal grants, the Authority was required to issue written assurances to the Secretary of Transportation that it would:

[M]ake its airport available as an airport for public use on fair and reasonable terms and without unjust discrimination, to all types, kinds, and classes of aeronautical uses including the requirement that ... each air carrier using such airport ... shall be subject to such nondiscriminatory and substantially comparable rates, fees, rentals, and other charges and such nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities, subject to reasonable classifications....

....

[T]he sponsor may establish such fair, equal, and not unjustly discriminatory conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport; ... the sponsor may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to service the civil aviation needs of the public.

In early September 1994, the Authority adopted a series of regulations titled the "Minimum Standards for Commercial Aeronautical Activities" (the Standards) which governed operations at the airport. The Standards define the "Airport Purpose" as: "[A]ny Authority action undertaking or development that is consistent in maintaining the non-certificated status of the Airport and in preserving the Airport funding category as a 'Reliever Airport' serving general aviation users. *Under no circumstances shall the Airport Purpose include scheduled air carrier service.*" (emphasis added)

Further, the Standards provide that:

An Air Carrier operator is an entity that *provides scheduled passenger services* and operates under the appropriate [federal aviation regulations] (including but not limited to Parts 135 or 121 or under the exemption authority of [federal aviation regulations] Part 298) with aircraft that provide no more than 30 passenger seats and are within the weight limitations established for the Airport in its Rules and Regulations. (*This category is not consistent with the Airport Purpose and will not be allowed to operate at the Airport unless required by final court order.*) (emphasis in original)

Golden Eagle provides unscheduled passenger aviation service to and from the Air-

port pursuant to a sublease agreement entered into on December 19, 1994, with a firm that leases facilities from the Authority.

On December 20, 1994, Golden Eagle was reissued an air carrier certificate by the Federal Aviation Administration (FAA). Known as a "Part 135 Certificate," that certificate authorized Golden Eagle to "operate as an air carrier and common carriage operations" pursuant to certain federal aviation regulations. Those regulations allow carrying up to 30 passengers for four scheduled round trips per week, per destination, in aircraft weighing less than 75,000 pounds, and with fewer than 30 seats.

That same day, Golden Eagle launched its first scheduled passenger flight between the Airport and Dalhart, Texas. It also announced immediate plans to initiate scheduled service to Grand Junction and future plans to conduct scheduled service to other Western Slope airports, and to Amarillo, Chicago, Kansas City, Houston, Dallas, Phoenix, Los Angeles, San Francisco, and Seattle.

Within the next three days, the Authority sought and the trial court granted a temporary restraining order against any further scheduled passenger service at the Airport. Later, after several hours of hearings, the trial court entered preliminary and permanent injunctions against defendants. This appeal followed.

During the pendency of this litigation, the Assistant Secretary for Transportation Policy of the United States Department of Transportation (DOT) issued an opinion letter to the Authority in which he stated that the prohibition of scheduled service from the Airport was inconsistent with federal law. Also, as a result of this controversy, a complaint was filed with the FAA; however, the FAA has yet to issue a decision.

## I.

Defendants first contend that, because the federal government has preempted the area of aerospace regulation, the trial court erred in granting injunctive relief to the Authority. We agree.

■ In determining whether federal law preempts an area, we must first look to congressional intent. *Hillsborough County v. Automated Medical Labs. Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Preemption may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614 (1977).

■ To determine whether express preemption exists, we must begin with the language of the statute and with the assumption that the language accurately reflects that legislative purpose. *FMC Corp. v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990).

■ Express preemption provisions should be construed as any other form of legislation. Thus, when the plain and ordinary meaning of the statute's words and phrases indicate that preemption is to apply broadly, we must construe the statute accordingly. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (Scalia, J., concurring in part and dissenting in part); *see generally* J. Chatowski, *Cipollone and the Clear Statement Rule: Doctrinal Anomaly or New Development in Federal Preemption,* 44 Syracuse L.Rev. 769 (1993).

### A.

■ Defendants assert that, because the prohibition of scheduled passenger service at the Airport is related to airline prices, routes, and services, the Authority's regulation is preempted under 49 U.S.C. § 41713(b)(1) (1994). We agree.

The Airline Deregulation Act of 1978 (Deregulation Act) significantly deregulated air transportation. It was enacted based on a belief that market forces would promote efficiency, innovation, and low prices, and that these market forces would improve the quality of air transportation. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

As initially enacted, the Deregulation Act expressly preempted the states from "enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the

force and effect of law relating to rates, routes, or services of any air carrier...." *See* Pub.L. No. 95–504, § 105(a)(1), 92 Stat. 1705, 1708 (1978)(previously codified at 49 U.S.C. § 1305(a)(1)(West 1988)). This preemption provision was included to prevent states from occupying the vacuum left by the removal of federal regulation. *Morales v. Trans World Airlines Inc., supra.*

In 1994, the preemption provision was repealed and reenacted with modifications, and is now codified at 49 U.S.C. § 41713(b)(1). *See* Pub.L. No. 103–272, § 1, 108 Stat. 745, 745 (1994). The modifications made in the reenactment did not alter the substance of the statute. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995)(fn.1).

In *Morales*, the United States Supreme Court focused on the words "related to" as the key phrase in the predecessor to § 41713(b)(1). Noting that the plain meaning of this phrase was broad, the Court defined it as: "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc., supra*, 504 U.S. at 383, 112 S.Ct. at 2036, 119 L.Ed.2d at 167 (quoting *Black's Law Dictionary* 1158 (5th ed.1979)).

The *Morales* Court also relied on its prior construction of the phrase "related to" as it appears in the preemptive language of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1144(a) (1988), which preempts state laws "insofar as they relate to any employee benefit plan." In the ERISA context, past decisions have held that this language preempts any state law that "has a connection with, or reference to, such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490, 501 (1983); *see also Houdek v. Mobil Oil Corp.*, 879 P.2d 417 (Colo.App.1994), *cert. denied*, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995).

Based on the plain language of the statute, and in light of the construction given to the similarly-worded ERISA preemption provision, the Court construed the predecessor to § 41713(b)(1) as preempting any state enforcement actions "having a connection with or reference to airline rates, routes, or services...." *Morales v. Trans World Airlines, Inc., supra*, 504 U.S. at 384, 112 S.Ct. at 2037, 119 L.Ed.2d at 167–68.

Under this construction, the Court determined that a state law may be found to be "related to" airline rates, routes, or services even when the law is not designed to affect these matters, or when its effect on them is only indirect. Moreover, it held that the preemption provision displaces all state laws that fall within its sphere, even including those that are consistent with the federal law's substantive requirements. *Morales v. Trans World Airlines, Inc., supra.*

In *American Airlines, Inc. v. Wolens, supra*, the Court held that the appropriate analysis for an Airline Deregulation Act express preemption question involved two parts: (1) whether the subject of the preemption dispute involves the enforcement of a law, regulation, or other provision having the force and effect of law; and if so, (2) whether the subject has a connection with or reference to airline rates, routes, or services. Only when both of these questions are answered in the affirmative does § 41713(b)(1) preempt state law. *See also Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423 (7th Cir.1996).

### 1.

As to the first prong of the *Morales–Wolens* test, the parties do not dispute that the regulation forbidding scheduled passenger service constitutes a law, regulation, or other provision having the force and effect of law.

### 2.

Defendants argue that, under the *Morales* test, the prohibition of scheduled passenger service is "related to" airline rates, routes, or services. We agree.

Congress did not define the word "services" as it is used in § 41713(b)(1). However, in 1979, shortly after the enactment of the Deregulation Act, the Civil Aeronautics Board (CAB) released a statement of general policy regarding the preemption provision. There, it determined that "preemption ex-

tends to all of the economic factors that go into the provision of the *quid pro quo* for a passenger's fare, including *flight frequency and timing ....*" *Implementation of Pre-emption Provisions of the Airline Deregulation Act of 1978*, 44 Fed.Reg. 9948, 9951 (February 15, 1979) (emphasis added).

■ This interpretation, provided by the agency responsible for the administration of the statute, should be accorded deference by a reviewing court. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Banner Advertising, Inc. v. People*, 868 P.2d 1077 (Colo.1994).

Like the CAB, the United States Court of Appeals for the Fifth Circuit, in *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir.1995)(en banc)(quoting *Hodges v. Delta Airlines, Inc.*, 4 F.3d 350, 354 (5th Cir.1993)(prior opinion released in division)), has construed the term "services" broadly, holding that:

'Services' generally represent a bargained-for or anticipated provision of labor from one party to another.... Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself. These matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline. It is these [contractual] features of air transportation that we believe Congress intended to de-regulate as 'services' and broadly to protect from state regulation.

*See also Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, supra; Abdu-Brisson v. Delta Air Lines, Inc.*, 927 F.Supp. 109 (S.D.N.Y.1996); *see generally Frontier Airlines, Inc. v. United Air Lines, Inc.*, 758 F.Supp. 1399 (D.Colo.1989)(rejecting a narrow construction of "services" for purposes of the preemption provision).

The *Hodges* court further noted that " 'Air service' referred at the time of the passage of the [Deregulation Act] to the point-to-point transportation of passengers, cargo or mail, and it encompassed the business of transportation *as well as the schedules* and type of

contract...." *Hodges v. Delta Airlines, Inc., supra,* 44 F.3d at 337 (emphasis added).

In a similar manner, the word "routes" has been given a broad construction in judicial decisions interpreting the predecessor to § 41713(b)(1). *See City of Dallas v. Southwest Airlines Co.*, 494 F.2d 773 (5th Cir. 1974), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974) (an aviation route includes within it the points of origin and destination).

Under this construction, an airline route encompasses the markets in which an airline is able to provide service. Thus, insofar as an airport's decision to prohibit certain kinds and classifications of air transport could limit access to a particular aviation market, it would necessarily follow that the decision would affect airline routes. *See City of Dallas v. Southwest Airlines Co., supra.*

Here, the Authority's regulation restricting scheduled passenger traffic at the Airport directly relates to the bargained-for exchange between an air carrier and its passengers. And, it is clear that an airline's ability to engage in scheduled passenger service bears a direct relation to its scheduling, a matter that is itself a part of its services. Thus, in our view, the Authority's regulation affects the scope and quality of services for purposes of § 41713(b)(1). *See* 44 Fed.Reg. 9951; *see also Hodges v. Delta Airlines, Inc., supra.* Likewise, because it removes the Airport as a point of origin or destination for defendants' scheduled flights and inhibits defendants' access to the Denver-area market, the regulation also affects airline routes. *See City of Dallas v. Southwest Airlines Co., supra.*

Consequently, the regulation falls within the express preemptive scope of § 41713(b)(1).

## II.

■ Defendants next contend that the trial court erred in concluding that the Standards were within the "proprietary powers" exception to the preemption doctrine. They argue that this determination should have been made by the FAA. Again, we agree.

49 U.S.C. § 41713(b)(3)(1994), in creating an exception to the broad preemptive effect of § 41713(b)(1), provides:

This subsection does not limit a State [or a] political subdivision of a State . . . that owns or operates an airport served by an air carrier holding a certificate issued by the Secretary of Transportation from carrying out its proprietary powers and rights.

Thus, a publicly owned airport may take certain action as a proprietor that it could not take as a regulator under its police power. *See City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (fn.14).

Some examples of areas which have been determined to be encompassed by proprietary control include noise control and perimeter rules, *Western Air Lines, Inc. v. Port Authority of New York & New Jersey*, 817 F.2d 222 (2d Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988); and peak-period take-off and landing fees, *Aircraft Owners & Pilots Ass'n v. Port Authority of New York*, 305 F.Supp. 93 (E.D.N.Y.1969). *See generally* W. Pennington, *Airport Restrictions: A Dilemma of Federal Preemption and Proprietary Control*, 56 J. Air. L. & Com. 805 (1991).

■ However, a public airport proprietor "is vested only with the power to promulgate reasonable, nonarbitrary and nondiscriminatory regulations. . . . Any other conduct by an airport proprietor would frustrate the statutory scheme." *British Airways Board v. Port Authority of New York and New Jersey*, 558 F.2d 75, 84 (2d Cir.1977). Thus, the proprietary powers exception to the preemption doctrine is not so broad as to permit a publicly owned airport to promulgate regulations that are in contravention of federal law.

However, the determination whether an asserted power by an airport falls within the proprietary powers exception has been made by federal, not by state, courts. *See British Airways Board v. Port Authority of New York. and New Jersey, supra; Skydiving Center of Greater Washington, D.C., Inc. v. St. Mary's County Airport Commission*, 823 F.Supp. 1273 (D.Md.1993); *City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir. 1974). *See also United Air Lines, Inc. v. County of San Diego*, 1 Cal.App.4th 418, 2 Cal.Rptr.2d 212 (1991).

Even then, some federal courts have found that negotiating the labyrinth of this pervasive regulatory scheme can be a treacherous endeavor. The decision in *New England Legal Foundation v. Massachusetts Port Authority*, 883 F.2d 157 (1st Cir.1989) illustrates the problem.

In 1988, the Massachusetts Port Authority Board of Members (Massport) approved a plan setting a new landing fee structure at Logan Airport in Boston. Various organizations filed complaints with the FAA, asserting that the landing fee structure was not fair and reasonable and that it discriminated against small aircraft. The Secretary of Transportation issued an "Order of Investigation" and referred the matter to an Administrative Law Judge for hearing and issuance of a written report.

In the meantime, the New England Legal Foundation and two other organizations sought declaratory and injunctive relief against Massport in the United States District Court for the District of Massachusetts, arguing that the fee structure violated various provisions of the Constitution. Although the court was asked to defer conducting a hearing or issuing a ruling pending the outcome of the administrative proceedings, it refused to do so. In its lengthy decision, interpreting the Airport and Airway Improvement Act of 1982, 49 U.S.C.A. § 2210 (West 1994), the court ruled in favor of Massport, determining that, as an airport proprietor, it was not precluded from setting reasonable landing fees and that its landing fees were reasonable.

Several months later, the Administrative Law Judge issued a comprehensive and detailed opinion in which he determined that the landing fee structure was preempted because it unduly interfered with both federal control of airspace management and national air transportation system access and that it frustrated the accomplishment of Congressional directives. He also found that the

proposed new landing fees were unfair, unreasonable, and unjustly discriminating.

The losing parties in both actions appealed to the Court of Appeals for the First Circuit. That court concluded that the district court committed error, not only in its decision, but also in not deferring to the Secretary's primary jurisdiction over this controversy as was requested.

The doctrine of primary jurisdiction, also known as the deference doctrine, "primarily serves as a means of coordinating administrative and judicial machinery." *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir.1979).

■ Three principal factors should be considered by a court in determining whether to defer: "(1) whether the agency determination lay at the heart of the task assigned the agency by Congress; (2) whether agency expertise was required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the Court." *Mashpee Tribe v. New Seabury Corp., supra,* at 580–81.

Applying those factors, the court in *New England Legal Foundation v. Massachusetts Port Authority, supra,* determined that, because the DOT's supervision and management of the nation's navigable air space is "intensive and exclusive," *City of Burbank v. Lockheed Air Terminal, Inc., supra,* 411 U.S. at 634, 93 S.Ct. at 1859, 36 L.Ed.2d at 554, the agency determination was central to promoting Congressional intent. Similarly, commenting that the "ALJ's recommended decision reflects the complexity and singularity of the subject at hand, and clearly imprints that it is not one receptive to amateur participation," *New England Legal Foundation v. Massachusetts Port Authority, supra,* 883 F.2d at 163, the court concluded that agency expertise could best provide a crucial evaluation of the issues. Consequently, it held that the district court erred in deciding the summary judgment motions on the merits and in refusing to defer to the agency.

Here, an analogous situation presents itself. The Authority sought judicial intervention after an official complaint filed with the FAA had started the administrative process. And, even though defendants presented a letter from the Assistant Secretary for Transportation Policy of the DOT stating that the Authority's regulation contravened federal law and policy, the trial court ruled on the merits of the proprietary powers exception. In our view, this was error.

In interpreting the Airport and Airway Improvement Act of 1982, we see no measurable difference in complexity between determinations regarding landing fee structures and those regarding the allowance of scheduled passenger service. Both involve crucial issues of aviation policy and practice; both, in our view, are better suited to resolution by the agency charged with such a task by Congress. *See Northwest Airlines, Inc. v. County of Kent, Michigan,* 510 U.S. 355, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994). A decision by a state court has the potential to undercut and undermine the "intensive and exclusive" federal airlines regulatory framework. *Northwest Airlines, Inc. v. Minnesota,* 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283, 1290 (1944); *see also Banner Advertising, Inc. v. People, supra.*

Accordingly, we conclude that the trial court here should have deferred to the expertise of the FAA.

### III.

In light of this disposition, defendants' other contentions of error are moot.

The judgment granting the permanent injunction is reversed.

DAVIDSON and ROY, JJ., concur.