**SOUTHERN AIRWAYS, INC.**

v.

**CITY OF ATLANTA et al.**

**Civ. No. C77–170A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

March 18, 1977.

Hugh M. Dorsey, Jr., Albert G. Norman, Jr., and David J. Bailey, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Southern Airways, Inc.

Ferrin Y. Mathews, Robert S. Wiggins, Murray F. Bahm, Atlanta, Ga., for City of Atlanta.

A. Paul Cadenhead, Atlanta, Ga., for Northwest Airlines, Inc.

Gambrell, Russell, Killorin & Forbes, David M. Brown, E. Smyth Gambrell, H. L. Russell, Atlanta, Ga., for Eastern Air Line & Trans World Airlines, Inc.

C. B. Rogers and Paul W. Stivers, Rogers & Hardin, Atlanta, Ga., for Delta Air Lines, Inc., United Air Lines, Inc., and Piedmont Aviation, Inc.

Robert S. Harkey, Law Department, Delta Air Lines, Inc., Atlanta, Ga., for Delta Air Lines, Inc.

## MEMORANDUM OPINION

O'KELLEY, District Judge.

On February 1, 1977, the plaintiff, Southern Airways, Inc., filed this action seeking to enjoin the defendant City of Atlanta from leasing facilities in the proposed midfield terminal at the Hartsfield Atlanta International Airport to the plaintiff under the terms and conditions contained in the lease agreement which was presented to the plaintiff and the other carriers serving the airport on December 17, 1976. The defendants, representing that the mere pendency of this action prevented their making bid awards which were to expire on March 20, 1977, and, therefore, exposed them to substantial delays in the completion of the project as well as enormously increased costs of construction and financing, requested an expedited hearing on the merits of the case. The request was granted, and the

case was tried before the court on February 28–March 2 and March 7–9, at which time the parties introduced testimonial and documentary evidence concerning the merits of the action.

As a result of the rapid growth of passenger traffic, both local and connecting, at its airport, the City of Atlanta has worked for a number of years on proposals for the expansion of its facilities for air travel. In recent years, these proposals have centered around the construction of a new passenger terminal in the mid-field area at the Hartsfield Atlanta International Airport. The preliminary discussions and proposals culminated in the City Council of Atlanta's adoption in November, 1974, of a resolution authorizing the Mayor, the Commissioner of Aviation, and the Commissioner of Finance to negotiate with the airline companies for the construction, phasing, and financing of a mid-field terminal facility.

On January 6, 1975, Southern, along with Delta Air Lines and United Air Lines, tendered to the City of Atlanta a letter of intent committing it to proceed with the mid-field project. Eastern Air Lines, on the other hand, had informed the interested parties of its intention to remain in the existing terminal. On February 25, 1975, however, Eastern advised the city that in light of Delta, United and Southern's commitments, it had reevaluated its decision and now desired to relocate in the mid-field terminal.

Under the present proposal, the mid-field terminal complex consists of a main terminal building which is connected to four rectangular concourses by an underground tunnel. The concourses, which contain the loading gates of the various carriers, are parallel to each other and connected only by the tunnel. This underground connecting tunnel is carefully designed to allow passengers to move efficiently from place to place within the terminal complex and contains a vehicle known as the "people mover" as well as a pedestrian walkway.

Under the gate allocation plan as it existed in the summer of 1975, Delta's gates were located on concourses A and B, South-ern was assigned 12 gates on concourse C, and Eastern's gates were located on the D concourse. This gate allocation was made on a "first come, first served" basis. Eastern was extremely dissatisfied with the location of its gates, and in March, 1976, a revised plan for a 104 gate mid-field terminal complex was proposed. Under this plan, Eastern was assigned 16 gates on concourse B and 17 gates on concourse C. The number of gates assigned to Southern on concourse C was reduced to 9. Obviously, Southern was unhappy with the new arrangement and sought through negotiations with Eastern to regain its original allocation of 12 gates on concourse C. When these discussions proved fruitless, Southern requested the City to rule upon the matter. The City refused to do so, stating that "gate allocations is a matter for the airlines to agree upon among themselves."

Subsequently, in May, 1976, Southern, in order to obtain the 12 gates which it believed necessary to support its future operations at the Hartsfield Airport, exchanged gate locations with United, thereby obtaining the necessary gate allotment on concourse D.

In August, 1976, Southern, and most of the other airline companies involved, executed an agreement with the City of Atlanta referred to as the "Phase II Agreement." The Phase II Agreement reaffirmed that substantial agreement had been reached on certain general terms, conditions, and provisions which would govern the financing, design, construction, use, and occupancy of the proposed mid-field terminal complex. It also provided, however, that those general provisions "do not represent all of the terms, conditions, and provisions which must necessarily be included in the lease agreement," but only that such conditions accurately reflect the intent of the parties, subject to mutually agreed upon modifications. The Phase II Agreement did not provide for any method of either determining the amount of lease payments to be charged to each airline company for their use and occupancy of the proposed central terminal complex or allocating to the vari-

ous airline companies the costs of maintenance and operation of the complex. With respect to the latter costs, however, the agreement did provide that they would be allocated in the lease agreement in such a way that each contracting airline company would pay a fair and equitable pro rata share.

Subsequent to the execution of the Phase II Agreement, representatives of the airline companies and the City of Atlanta engaged in extensive discussions and negotiations concerning the preparation of various formulas to be incorporated in the lease agreement for allocating the rental charges and the costs of maintenance and operation of the mid-field terminal project among the several carriers. On September 24, 1976, Southern presented to the City of Atlanta its proposal for the allocation of rentals and costs, the pertinent provisions of which are as follows: (1) The cost of the space leased exclusively by an airline in the terminal building would be equal regardless of the location in the terminal. (2) The cost of the common space in the terminal building would be allocated among the airlines on the basis of the number of enplaned passengers. (3) The rate charged an airline for the rental of a gate would be based upon the location of that gate, with gates on concourses closest to the terminal building rented at a premium rate while a lower rental rate would be charged for gates located on concourses farthest from the terminal building. (4) The annual maintenance and operation costs of the people mover and pedestrian mall would be allocated on the basis of enplaned passengers. On October 15, 1976, Delta Air Lines submitted to the City an analysis of the Southern proposal, to which Southern responded on November 6, 1976. Without belaboring the point, suffice it to say that during the months of October, November, and December, 1976, numerous meetings were held and correspondence exchanged between representatives of the airline companies and the City regarding the rent allocation question. Finally, on December 17, 1976, the City of Atlanta sent out a proposed lease agreement to the carriers serving the Hartsfield Atlanta International Airport and notified them that due to time restraints imposed by the construction schedules, the lease agreement would have to be executed by December 22, 1976. The notice also informed the carriers that the City would assume that those companies which did not execute the lease on that date were not accepting the proposed lease agreement and did not desire to lease space in the mid-field terminal complex.

The evidence shows that the City, in devising the manner in which it would lease space at the mid-field terminal complex and the manner in which it would allocate the costs of maintenance and operation thereof, generally considered traditional concepts of airport rental practices as well as concepts developed through negotiations with the airlines, including some of the concepts suggested in the Southern proposal. The following is a comparison of the proposed formulas for allocating rentals contained in the Southern proposal to those finally adopted by the City and included in the lease agreement which was forwarded to each of the carriers.

1. Under the City's plan, the rental payment for terminal exclusive space is determined by multiplying the average cost per square foot of the terminal building by the number of square feet which a particular carrier occupies exclusively.

 Southern's proposal is identical to the City's plan.

2. Under the City's plan, the rental payment for terminal joint leased space is determined by multiplying the cost of the joint leased space by the relative percentage of a carrier's exclusive space located on the upper terminal level.

 Southern's proposal is that such costs be allocated on the basis of a carrier's relative percentage of enplaned passengers.

3. The rental payment for concourse exclusive space is determined under the City's lease by multiplying the average cost per square foot of all the concours-

es by the number of square feet occupied exclusively by a particular airline.

Under the Southern proposal, the rent would be determined by the same basic formula except that, depending on the location of the exclusive space, the average cost per square foot would be either increased by the addition of a premium or reduced by a discount. The premiums or discounts associated with each of the concourses is as follows: concourse A—25% premium; concourse B—8.3% premium; concourse C—8.3% discount; and concourse D—25% discount.

4. Under the City's plan, the rental payment for joint leased space on the concourse is determined by multiplying the following elements: the average cost per square foot of all the concourses; the square footage of joint leased space in a particular concourse; and the carrier's relative percentage of the exclusive space located in the upper level of the particular concourse.

Southern's proposal varied in two respects. First, the premium and discount system was injected into the formula in a manner identical to that outlined above. Second, the final element in Southern's proposal was the carrier's percentage of total exclusive space on a particular concourse, rather than its percentage of exclusive space on the upper concourse level.

5. Under the City's plan, the rental payment for the apron area, both exclusive and joint leased space, is determined by multiplying the average cost per square foot of aircraft parking and ramp area by the square footage of a carrier's exclusive aircraft parking and ramp area.

Under the Southern proposal, the rent would be determined by the same basic formula except for the injection of the premium and discount system.

Turning to an examination of the formulas to be used in allocating the costs of maintenance and operation, it should be emphasized initially that Southern's proposal included an estimate of maintenance and operation costs, along with project costs, in arriving at annual rental figures for the purposes of the allocation methods it proposed.[1] It is obvious, therefore, that Southern had proposed that these costs be allocated in the same fashion and by the same formulas as the project costs.[2] The City lease agreement, however, provides for allocation as follows:

1. Each airline would be responsible for its own maintenance and operation costs within its exclusive area in the terminal and concourses.

2. As to the maintenance and operation costs associated with the common space in the terminal, pedestrian mall, and moving sidewalk, the City proposal is that 20% of these costs would be divided equally among all airline companies, 40% would be allocated on the basis of each airline's relative percentage of exclusive apron area, and 40% of the costs would be allocated based on the relative percentages of enplaned passengers.

3. Maintenance and operation costs relative to the concourse common area would be apportioned based on the airline's exclusive space in the upper level of the concourse relative to all airlines' exclusive lease space in the upper level of that particular concourse.

4. The costs of operation and maintenance of apron areas would be allocated based on the airline's exclusive apron area relative to the total exclusive apron area for all airlines.

5. While the Southern proposal advocated that the maintenance and operation costs associated with the people mover be apportioned solely on the basis of

---

1. The estimate did not include, however, any of the costs associated with police and fire protection.

2. Since the cost of installation of the people mover is being borne by the City, the Southern proposal included a specific formula for the allocation of the cost of maintenance and operation of this vehicle.

relative percentages of passengers, the City's formula allocates 20% of such costs equally among the airlines and apportions the remaining 80% based on relative percentages of enplaned passengers.

6. The cost of fire protection as well as the costs associated with the temporary roads and fencing are allocated pursuant to the 20/40/40 formula described above.

7. The cost of police protection, like the cost of maintenance and operation of the people mover, is allocated pursuant to the 20/80 formula.

On December 21 and 22, 1976, Eastern, Delta and Piedmont executed copies of the lease agreement. On that same day United and Northwest gave written indications of intent to execute the agreement. Southern did not execute the lease agreement but, rather, on February 1, 1977, filed this lawsuit seeking a declaration of its rights and an injunction restraining the defendant City from requiring it to execute the lease agreement and accept the cost allocations used in fixing the rentals thereunder or excluding it from the mid-field terminal complex.

The plaintiff's amended complaint consists of six counts. In count one the plaintiff alleges that the City has violated section 18(a)(1) of the Airport and Airway Development Act, 49 U.S.C. § 1718(a)(1), by requiring Southern to execute a lease agreement which provides for rates, rentals, and other charges which are allegedly discriminatory and not substantially comparable to the rates, rentals, and charges applicable "to all such air carriers which make similar use of the Atlanta airport and which utilize similar facilities at such airport." In count two the plaintiff alleges that by requiring it to execute the lease agreement and accept the cost allocations used in fixing the rentals thereunder or be excluded from the mid-field terminal complex, the City has imposed an impermissible burden on interstate commerce in violation of article I, section 8, paragraph 3 of the Constitution of the United States. The plaintiff alleges in count three that the City's actions have denied it equal protection of the laws as guaranteed by the fourteenth amendment. In count four the plaintiff alleges that since the lease agreement and the rentals thereunder deprive it of the uniform use of the facilities at the Atlanta airport, the City, by requiring the plaintiff to execute the lease agreement, has violated the Uniform Airports Law of Georgia, Ga.Code Ann. § 11–201 et seq. Count five alleges a breach of the Phase I and Phase II Agreements, which imposed upon the City the duty of good faith and fair dealing in the performance of those agreements, as well as the obligation to tender to the plaintiff a lease agreement covering the facilities at the mid-field terminal complex which contained just and reasonable terms. Finally, in count six of the complaint, as amended on the day the trial commenced, the plaintiff alleges that certain defendant airlines engaged in an unlawful combination and conspiracy to unreasonably restrain trade and commerce in passenger air transportation in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. By agreement, defendants National and Northwest have been dismissed from count six.

Section 18(a)(1) of the Airport and Airway Development Act, 49 U.S.C. § 1718(a)(1), requires each city sponsor of a grant under that act to make its airport available for public use on fair and reasonable terms and without unjust discrimination, including the requirement that (A) each air carrier . . . using such airport shall be subject to nondiscriminatory and substantially comparable rates, fees, rentals, and other charges and nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities . . . . .

In support of its claim under this section, the plaintiff contends that since the rental formulas contained in the City lease agreement take into account neither the differences in value of rental locations nor the

fact that the cost of maintenance and operation of the various facilities provided at the complex is principally determined by the large number of passengers brought into the complex by the major carriers, the rental rate charged plaintiff under those formulas is discriminatory and is not substantially comparable to that charged other airlines. In addition to their contention that the rental rate charged the plaintiff under the City lease agreement is nondiscriminatory and is substantially comparable to that charged the other airlines, the defendants advance two preliminary arguments in opposition to the plaintiff's position.

■ First, the defendants argue that section 18(a)(1) of the Airport and Airway Development Act applies only to discrimination between classes of carriers, and since the parties to this lawsuit are all in the same class, that section is inapplicable. In support of their position, the defendants rely upon the remarks of Senator Cannon, the proponent of the 1976 amendment to this section. 122 Cong.Rec. 4306–07 (daily ed. Mar. 25, 1976). Admittedly, Senator Cannon did state that the primary evil at which the amendment was directed was discrimination against the supplemental or charter carriers. He did not state, however, that the amendment was limited to that type of discrimination. In fact, in light of the amendment's wording, it is inconceivable that he could have made such a statement. After careful consideration, this court concludes that the 1976 amendment to section 18(a)(1) clearly extends its prohibition to the type of discrimination alleged in this case.

Second, the defendants, citing *Aircraft Owners & Pilots Association v. Port Authority of New York*, 305 F.Supp. 93 (E.D. N.Y.1969), argue that there is a distinction between statutory standards and the standards of judicial review and that even though section 18(a)(1) may require the terms of the City lease agreement to be "nondiscriminatory" and "substantially comparable," the court's inquiry in reviewing the lease agreement should be limited

to the question of whether there is a rational basis for such terms. It is unnecessary for the court to address the legal questions presented by the defendants' argument, however, because, as will be developed later, the court concludes that except for the "20% equal" provision in a number of the cost allocation formulas, the charges levied pursuant to the lease satisfy both standards. As to the "20% equal" provision, the court finds it to be invalid, regardless of which standard is employed.

■ Before examining the rates and charges established by the City lease agreement, it is necessary to briefly comment on the "nondiscriminatory" and "substantially comparable" standards added by the 1976 amendment to section 18(a)(1). These standards do not require identical treatment. *Cf. Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974). They do require, however, substantially similar treatment. Obviously, the degree of similarity which is feasible will vary with the circumstances of each case.

■ Applying these standards to the lease agreement challenged in the instant case, this court concludes that the City's failure to incorporate into the formulas employed in determining the rental rate of space located on the concourses the differences in the value of the various concourses is not unreasonable or discriminatory and does not result in Southern's being charged a rental rate which is not substantially comparable to that charged the other airlines. In arriving at this conclusion, the court considered numerous factors. First, while the concept of rent differentials based on gate location has been debated for a number of years, no other airport in the nation has adopted such a proposal. Therefore, in considering Southern's proposal, neither the City nor the airline companies had the benefit of any precedent in the establishment and administration of such a plan. This lack of guidance is compounded by the extreme difficulty, if not impossibility, of evaluating a particular location. While Southern's proposal assigned the same value for all gates located on a particular

concourse, it could be successfully argued that a gate located on the end of a particular concourse is less valuable than one located near the spine. In fact, a gate located near the spine on concourse D could be said to be more valuable than a gate located at the end of concourse A. The essence of the court's observation is relatively simple. If the City were to adopt the concept of rate differentials for different locations, it would then be faced with the Herculean task of evaluating each of the 104 gates at the mid-field terminal separately. To do otherwise might subject the City to additional charges of discrimination.

Turning to an examination of the specific elements which allegedly contribute to the difference in value between the concourses, this court finds that each concourse possesses advantages and disadvantages and that an attempt to quantify any difference in value between the concourses would be difficult if not impossible. In fact, after carefully sifting and examining the various elements, this court has grave reservations as to whether it can unequivocally be stated that there is, in fact, any difference in value. The evidence reveals that the cost of moving baggage to a gate location on concourse D will be a minimum of $16,000 a year more than the same cost associated with a gate location on concourse A. Such a differential is offset, however, by the savings of a minimum of $100,000 a year in taxi costs associated with a location on concourse D.

The plaintiff has also raised the question of the effect of a location on concourse D on the public image of the airline company. This court finds that a carrier's location at the airport terminal is a minor consideration of originating passengers in choosing an airline. It should also be observed at this point that this case does not present a situation in which an originating passenger must resort to the people mover to go the plaintiff's gates while he is not required to do so to go to the gates of other airlines. Rather, the originating passenger at the Atlanta mid-field terminal must resort to the people mover as a source of transporta-

tion to the gates of all airlines. Once that passenger is required to board the people mover, it will make little difference whether he is required to travel to concourse A, B, C, or D. In any event, whatever the effect of gate location on the originating passenger's choice of airline, it has even less of an effect on the decisions made by the transferring passengers who constitute approximately 79% of Southern's Atlanta enplanements.

One further disadvantage to a gate location on concourse D is the additional time necessary to accomplish the transfer of baggage to the airplane and the consequential potential for flight delay. The court concludes, however, that this additional time is insignificant, especially for a carrier like Southern which has a lower volume of traffic. In any event, any passenger inconvenience which may result from the delay of flights leaving from gates located on concourse D is somewhat offset by the distinct advantage enjoyed by the incoming traffic on concourse D relative to the boarding of the people mover. Since the passengers on concourse D are accorded the first opportunity to board the people mover, they are assured that there will be sufficient space in that vehicle to accommodate them. The passengers on the other three concourses, however, do not have that assurance. Also, concourse D possesses the advantage of providing the best location for future expansion. An airline located on that concourse can expand without destroying the contiguity of its facilities.

One final point should be noted concerning the differential in value of the various concourses. In order to reduce its amount of exclusive space and thereby its payments under the lease, Southern was permitted to change the configuration of the southern portion of concourse D. While the other concourses are rectangular in shape, the southern portion of concourse D is irregular. This fact, of course, resulted in a higher cost of construction per square foot in concourse D. Under the City's lease agreement, however, Southern does not bear the increased cost but, rather, it is distributed

among all of the airlines. This fact alone accords Southern preferential treatment.

■■■ Turning now to the formulas employed to allocate the rental associated with the common space in the terminal and the cost of maintenance and operation, the court concludes that except for that part of those formulas which allocates 20% of the cost of maintenance and operation equally among the airlines, those formulas do not violate section 18(a)(1) of the Airport and Airway Development Act. As to the "20% equal" provision, however, this court concludes that in the circumstances of this case that provision is patently discriminatory and results in the small carriers, including Southern, being charged a rate not substantially comparable to that charged the two major airlines. The defendants attempt to support this part of the formula by asserting that it is a provision traditionally employed to charge to the various carrier tenants the cost of the privileges of use and availability. The court will agree with the defendants that a charge for such privileges is appropriate. The use of the "20% equal" provision, however, is unreasonable in the circumstances as they exist at the Atlanta airport.

The court's conclusion is compelled by a consideration of the interaction of the substantial dollar amount which will be allocated pursuant to the "20% equal" provision and the extreme disparity in the ratio of passengers and exclusive space which exists between the two major carriers and the other carriers servicing the Atlanta airport. The evidence reveals that an initial projection of $1,300,000 in costs will be allocated equally among the airlines by virtue of the "20% equal" provision. By rough approximation, this allocation results in a $200,000 per year charge to each carrier.[3] Of course, since the cost of maintenance and operation of the mid-field terminal facilities will escalate with time, so will the

charges allocated on the basis of the "20% equal" provision.

The second factor considered by the court in reaching its conclusion is the extreme disparity in the percentage of passengers and the percentage of exclusive space accorded the two major airlines and that accorded the other carriers at the Atlanta airport. The evidence establishes that based upon 1975 figures, Delta and Eastern accounted for 86% of the traffic at the Atlanta airport. Not one of the other airlines had greater than 5% of the total 1975 Atlanta enplanements, and two of those carriers, Northwest and TWA, had less than 1% of those enplanements. In the proposed mid-field terminal complex, the two major carriers will occupy approximately 69% of the total exclusively leased area. With the exception of Southern, which will occupy approximately 11½% of the total exclusively leased area, each of the other airlines occupy less than 8% of the area. Again, two airlines, National and TWA, each occupy less than 2% of the total exclusively leased area. In view of these circumstances, the court concludes that the equal allocation of as high as 20% of certain costs of maintenance and operation is discriminatory and unreasonable and, therefore, violative of section 18(a)(1) of the Airport and Airway Development Act.

■■■ The court's resolution of count one renders consideration of counts three, four, and five unnecessary. Count two, however, presents issues which, although somewhat similar to those presented by counts one, three, four, and five, require separate discussion. In count two plaintiff alleges that by requiring it to execute the lease agreement and accept the cost allocations used in fixing the rentals thereunder or be excluded from the mid-field terminal complex, the City has imposed an impermissible burden upon interstate commerce in

3. This figure is based on the assumption that there will be seven carriers leasing space at the mid-field terminal complex. While there are presently eight airline companies serving the Atlanta airport, two of these have indicated that they plan to withdraw from the mid-field

project. One of those carriers, however, is considering the possibility of subleasing space at the new terminal, and if it does so, it would be responsible for its share of the costs under the "20% equal" provision.

violation of article I, section 8, paragraph 3 of the Constitution. In order to establish that a charge levied against an interstate carrier imposes such a burden, however, the plaintiff must show that it (1) discriminates against interstate commerce in favor of intrastate commerce, (2) is imposed on the privilege of doing interstate business as distinguished from being imposed for the use of facilities provided by the state, or (3) exceeds fair compensation to the state. *Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 70 S.Ct. 806, 94 L.Ed. 1053 (1950). The only question presented by the case *sub judice* is whether the charges established in the City lease agreement are excessive in comparison with the governmental benefit conferred. It is well settled that in order to resolve this question, one must focus on the amount of the charge rather than its formula. *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972). If the amount of the charge "is based on some fair approximation of use or privilege for use," it does not impose an impermissible burden upon interstate commerce. *Id.* at 716–17, 92 S.Ct. at 1355. After careful consideration, the court concludes that the charges levied in the instant case under the City's lease agreement satisfy the *Evansville Airport* standard.

 Much of the argument relating to the antitrust claim contained in count six of the amended complaint has centered on the relative applicability of the *Noerr-Pennington* doctrine[4] and the state action immunity established in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Since the court concludes that the plaintiff has failed to establish a conspiracy in restraint of trade, however, this court finds it unnecessary to consider the applicability of those principles to the circumstances presented in this case.

It is well settled that an explicit agreement is not a necessary part of a Sherman Act conspiracy. *United States v. General*

*Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). The conspiracy or agreement may be proved entirely by circumstantial evidence such as the conduct of the parties. In *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946), the Supreme Court stated that

> where the circumstances are such as to warrant [the] finding that the [alleged] conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.

*Accord, American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975). In the instant case, however, such a conclusion is not justified. There is not sufficient evidence in this case that any of the airline carriers agreed on package deals or trade-offs whereby Delta and Eastern agreed to support and aid the dominant carriers in other locations in return for their support of Delta and Eastern in the fight against the Southern proposal. Nor does this court find any other circumstances from which a conspiracy can be inferred. The City was obligated under the Airport and Airway Development Act to consult the airlines concerning the development of the midfield terminal complex project. In attempting to persuade the City to accept their various proposals, each of the airlines was placed in a negotiating status vis-a-vis the other airlines. There was no concerted action on the part of the airline carriers to reject Southern's proposal. Rather, each of the airlines had formulated its own proposals. Since the City could not incorporate into the lease the oftentimes conflicting proposals advanced by the numerous airline carriers, the carriers began a series of negotiations with each other. The purpose of these negotiations is obvious. Each airline would advance arguments to the other car-

---

4. *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor* *Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

riers in an attempt to get those carriers to accept and support its proposals. Such circumstances do not establish a Sherman Act section 1 conspiracy.

The City of Atlanta has recently filed a motion to supplement the record in this case. The motion has been set down for hearing at 10:00 a. m. on Friday, March 18, 1977. This memorandum opinion will be further supplemented following that hearing and an order entered pursuant thereto.

## SUPPLEMENTAL OPINION AND ORDER

By memorandum opinion dated March 18, 1977, this court ruled that the "20% equal" provision contained in the formulas employed to allocate rental associated with certain costs of maintenance and operation in the terminal complex was patently discriminatory and resulted in the small carriers, including Southern, being charged a rental rate not substantially comparable to that charged the two major airlines. At that time the court was prepared to enjoin the City from requiring the plaintiff to sign a lease containing this provision. Subsequent to the announcement of the court's decision, however, the City revised the lease agreement so as to eliminate the objectionable provision. The City then moved the court for permission to supplement the record by submitting the revised formulas for the court's consideration prior to the entry of final judgment. In turn, the plaintiff moved to amend its complaint in order to extend its claims to the revised formulas. Both motions were granted, and on March 18, 1977, the court heard evidence relating to the revised formulas.

In its attempt to formulate a revised method of cost allocation, the City met with representatives of the airlines in order to solicit their views. As usual, the airlines could not agree. The City then proceeded to revise the formulas without consultation with representatives of the carriers. The revised allocation methodology adopted by the City and submitted to the court for consideration is as follows:

1. As to the costs of maintenance and operation associated with the people mover, the pedestrian mall, and the moving sidewalks, the revised formulas allocate one-third of these costs on the basis of each airline's relative percentage of enplaned passengers, one-third on the basis of each airline's relative percentage of upper level exclusive area in the terminal building, and one-third on the basis of an airline's percentage of exclusive space in the upper level of the concourse buildings.
2. All of the costs associated with the jointly leased space in the terminal building is allocated on the basis of each airline's total exclusive area in the terminal building.
3. As to the maintenance and operation costs associated with the mechanical building as well as the costs of police and fire protection, the revised formulas allocate 20% of these costs on the basis of an airline's relative percentage of enplaned passengers and apportions the remaining 80% on the basis of an airline's relative percentage of the exclusive area in the upper level of the terminal and concourse buildings.

After careful consideration of the evidence adduced at the hearing as well as that previously introduced at the trial of this case, the court concludes that these revised formulas are not unreasonable or discriminatory and do not result in Southern's being charged a rental rate which is not substantially comparable to that charged the other airlines.

The plaintiff's primary objection to the revised formulas is that they do not accord the relative percentage of enplaned passengers component the weight it deserves. Concerning the costs of maintenance and operation associated with the mechanical building as well as the cost of police and fire protection, however, Mr. Perry admitted that these costs were for the most part a function of space. While the number of enplaned passengers does play some role in the cost of these services, no evidence was introduced as to its relative importance. In

allocating 20% of the costs on the basis of enplaned passengers and 80% on the basis of terminal and concourse upper level exclusive space, the revised formulas are not unreasonable or discriminatory.

As to the costs of maintenance and operation associated with the jointly leased space in the terminal building, the plaintiff argues that since the size of that area is a function of the number of passengers which must be accommodated and since the costs of maintenance and operation of that area are directly affected by the number of passengers using the area, the formula for allocating the costs of maintenance and operation of the terminal jointly leased space should be based at least in part on the percentage of enplaned passengers. The difficulty with the plaintiff's argument, however, is that the jointly leased space in the terminal building is also determined by the amount of space exclusively occupied by the airlines in that building. Furthermore, the amount of exclusive space which an airline possesses in the terminal building is in large part determined by the number of passengers which that carrier predicts it must serve. In summary, this court concludes that the allocation of all of the costs associated with the jointly leased space in the terminal building on the basis of an airline's total exclusive area in that building is not unreasonable or discriminatory.

Finally, concerning the formula employed to allocate the costs of maintenance and operation associated with the people mover, the pedestrian mall, and the moving sidewalks, the plaintiff contends that these costs should be allocated exclusively on the basis of a carrier's relative percentage of enplaned passengers. This contention, however, overlooks the fact that some charge for the privilege of use and availability is appropriate as well as the fact previously discussed that an airline's amount of exclusive space is dependent upon its evaluation of the number of passengers which it will have to serve.

One final point should be noted concerning the court's consideration of the revised formulas. The plaintiff does not contend that these formulas contain elements which are inappropriate. Rather, the plaintiff's objection concerns the proportions assigned to the various elements. The court has carefully considered the revised formulas, and while it may have assigned different proportions to the various elements, it cannot say that the formulas as presently constituted are discriminatory or unreasonable.

In view of the amendment to the lease, no relief will be granted in favor of the plaintiff against the City. Rather, the clerk is directed to enter judgment in favor of the defendants. Each party is to bear its costs of this action.