ISLAND AVIATION, INC.,              )        CV NO. 81-0048y
                                    )
                Plaintiff,          )
                                    )
        vs.                         )        DECISION
                                    )
MARIANA ISLANDS AIRPORT             )
AUTHORITY, et al.,                  )
                                    )
                Defendants.         )
                                    )

LAURETA, District Judge:

        The parties have filed cross-motions for partial summary
judgment.  The primary issue is whether the "departure facility
service charge" (DFSC) imposed by defendant Mariana Islands
Airport Authority (MIAA) upon plaintiff Island Aviation (Island
Air) violates 48 U.S.C. § 1513(a) by taxing air passengers, the
carriage of air passengers, the sale of air transportation or
gross receipts therefrom.  The Court concludes that: (1) § 1513
did not apply in the Northern Mariana Islands before January 9,
1978; (2) the DFSC does not violate § 1513(a); (3) § 1513(b)
permits MIAA to assess the DFSC according to a reasonable per-
passenger basis formula; and (4) Island Air owes MIAA unpaid DFSC
assessments in an amount to be determined in subsequent proceedings
The Court accordingly grants defendants' motion and denies Island
Air's motion on those four questions.  The Court grants partial
summary judgment to Island Air declaring that § 1513 has applied
in the NMI since January 9, 1978.  The Court also grants plaintiff
leave to its complaint.

I.  FACTS

Island Air is a corporation organized under the laws of Guam.  Since March 1977 it has operated pursuant to 49 U.S.C. § 1301 et seq. (the Federal Aviation Act) as a scheduled commercial air carrier.  It carries passengers between the islands of Saipan, Tinian and Rota in the Northern Mariana Islands (NMI) and Guam.  Island Air claims to be the successor in interest of now-defunct Indo-Pacific International Inc. (Trans-Micronesian Airways).  Between June 1978 and August 1981, Trans-Micronesian Airways also operated under the Federal Aviation Act as a passenger carrier between Guam and Saipan, Tinian and Rota.

MIAA controls and maintains the Saipan, Tinian and Rota airports which Island Air and Trans-Micronesian Airways have used when flying between Guam and the NMI.  MIAA is a public corporation of the NMI government.  Under rule-making authority conferred by Public Law No. 6-58(5) (1975), MIAA has established and assessed various fees against air carriers using NMI airports.

The DFSC is one of the fees.  MIAA has imposed the DFSC at the Saipan airport since March 1977, at the Tinian airport since August 1981, and at the Rota airport since October 1979.  Until October 1, 1977, the DFSC was $2.50 per revenue passenger originating his or her flight in the NMI.  Since that date, the DFSC has been $3.50 per originating

///

356

revenue passenger.[1]/ The parties agree that Island Air and

Trans-Micronesian Airways paid some of MIAA's DFSC assessments

since March 1977. Island Air alleges that it has paid

$225,938 and that Trans-Micronesian Airways remitted $146,399.

The parties also agree that Island Air has refused to pay

some DFSC assessments. MIAA avers that as of September 30, 1981

Island Air owes $52,276 in unpaid assessments.

Island Air filed this action on September 3, 1981.

It alleges jurisdiction under 48 U.S.C. § 1694a(a) and invokes

the remedial provisions of 28 U.S.C. § 2201-2202 and 28 U.S.C.

§ 1651. It seeks the following relief:

1. A declaration that 49 U.S.C. § 1513 prohibits the assessment of the DFSC;

2. A permanent injunction against the .assessment or collection of the DFSC or any similar fee based upon the number of passengers carried by Island Air;

3. A refund of DFSC assessments paid by Island Air and Trans-Micronesian Airways since March 1977 or, in the alternative, an order crediting those payments and accumulated interest against future payments properly owed to MIAA; and

– – – – – – – – –

[1]/ The DFSC appears to be a major source of MIAA's revenues. During the 1981 fiscal year, MIAA's aviation revenues constituted approximately 66.57% of its total revenues, and DFSC receipts comprised 60% of its aviation revenues. Affidavit of Carlos Shoda, Executive Director of the NMI Commonwealth Ports Authority, paragraphs 16-17, appended to Defendants' Motion Memorandum.

4.  Further relief which the Court deems
    just and equitable.

Defendants filed their First Amended Answer and
Counterclaim on November 13, 1981. They argue that the DFSC
is a service charge for the use of airport facilities which
49 U.S.C. § 1513(b) expressly allows.[2/] They accordingly seek:

1.  A declaration that MIAA may assess
    the DFSC; and

2.  An award to MIAA of unpaid DFSC
    assessments, court costs and
    interest accrued up to the date of
    judgment.

Island Air moves for a partial summary judgment
declaring that:

1.  49 U.S.C. § 1513 has applied within
    the NMI since January 9, 1978; and

2.  The DFSC violates § 1513(a).

Island Air requests leave to amend its complaint if the
Court denies its motion. It urges that even if § 1513
permits the DFSC, the DFSC is unreasonable and therefore
violates 49 U.S.C. § 1718.

_ _ _ _ _ _ _ _

[2/]   Defendants also resist Island Air's refund claim on the
independent ground that Island Air is estopped from recovering
because it voluntarily paid DFSC assessments without protest.
The instant motions neither raise this issue nor necessitate
its resolution.

Defendants also move for partial summary judgment. They ask the Court to declare that:

1.  49 U.S.C. § 1513 did not apply within the NMI prior to January 9, 1978;

2.  49 U.S.C. § 1513(b) allows MIAA to impose the DFSC; and

3.  Island Air owes MIAA unpaid DFSC assessments in an amount to be determined in subsequent proceedings.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

## II.  DISCUSSION

██ Federal Rule of Civil Procedure 56(c) establishes the review standard applicable to the parties' cross-motions. In order to prevail a party must demonstrate that there is no material factual issue and that the party is entitled to judgment as a matter of law.

Title 49 U.S.C. § 1513 provides in relevant part:

> (a)  No State (or political sub-division thereof, including the Common-wealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the terri-tories or possessions of the United States or political agencies of two or more States) shall levy or collect a tax, fee, head charge, or other charge, directly or in-directly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom...

> (b)  Nothing in this section shall prohibit a State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and <u>nothing in this section shall prohibit a State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities</u> (emphasis added).

360

The instant motions present four questions: (1) whether § 1513 applied in the NMI before January 9, 1978; (2) whether § 1513 has applied in the NMI since that date; and (3) whether the DFSC violates § 1513. The Court concludes that the answer to the first and third questions is no, and that the answer to the second question is yes.

### A. Inapplicability of § 1513 in the NMI Before January 9, 1978

During oral argument Island Air conceded defendants' assertion that § 1513 did not apply in the NMI before January 9, 1978. This concession does not relieve the Court of its duty to independently decide the issue. See Torres v. Commonwealth of Puerto Rico, 442 U.S. 465, 471 n.3, 99 S.Ct. 2425, 2429 n.3, 61 L.Ed.2d 1 (1979). After reviewing § 1513 and the general structure of the Federal Aviation Act, the Court agrees with the parties.

The NMI is part of the Trust Territory of the Pacific Islands which the United States administers under

///
///
///
///
///
///
///
///

the Trusteeship Agreement.[3] As explained in II-V, *infra*, the Covenant[4] determines which federal statutes have applied in the NMI since January 9, 1978. The applicability of § 1513 in the NMI before that date depends upon whether § 1513 applied throughout the Trust Territory.

The issue thus becomes whether Congress manifested an intention before the Covenant's enactment to include the Trust Territory within the coverage of the Federal Aviation Act in which § 1513 appears. People of Enewetak v. Laird, 353 F.Supp. 811, 815 (D.Haw. 1973). Congress has sometimes indicated this intention by including the Trust Territory within a statutory definition of the term "State" or "United States". Id. and n.8. The Federal Aviation Act does not define the term "State". It defines the "United States" as "the several States, the District of Columbia, and the territories and possessions of the United States, including the territorial waters and overlying airspace thereof." Title 49 U.S.C. § 1301(41)[5] The definition's reference to "territories" and "possessions" is inherently ambiguous and imprecise. As the United States Supreme Court has held, the

_ _ _ _ _ _ _ _ _ _

[3] Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665.

[4] Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Pub. L. No. 94-241, 90 Stat. 263, reprinted in 48 U.S.C. § 1681 note (1976).

[5] This definition was codified at 49 U.S.C. § 1301(38) in the original 1958 Federal Aviation Act.

362

meaning of the word "territory" or "possession" in a statute depends upon the particular legislation's general purposes, its character and aims, and the overall context in which the word is employed, rather than upon a consideration of the word alone. District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613, reh.denied 410 U.S. 959, 93 S.Ct., 1411, 35 L.Ed.2d 694 (1973)("territory"); Vermilya Brown Co. v. Connell, 335 U.S. 377, 386-388, 69 S.Ct. 140, 145-146, 93 L.Ed. 76 (1948), reh.denied 336 U.S. 928, 69 S.Ct. 652, 93 L.Ed. 1089 (1949)("possession").[6/] For two reasons, the Court concludes that Congress implicitly excluded the Trust Territory from the original Federal Aviation Act's geographical scope.

First, the Act initially covered only areas under United States jurisdiction over which the United States claims sovereignty, and the Trust Territory is not such an area. The legislation's fundamental purpose was to ensure the safe and efficient use of navigable airspace in the United States. H.R. Rep. No. 2360, 85th Cong. 2d Sess., reprinted in 1958 U.S. Code Cong. & Ad. News 3741. In conjunction with its statement of this

— — — — — — — — — —

[6/]    The rules stated in Carter and Vermilya Brown prevail over one lower court's ostensibly broad suggestion that "the laws of the United States... only apply to the Trust Territory if Congress ha[s] expressly so provided in the statute." Gale v. Andrus, 643 F.2d 826, 834 (D.C.Cir. 1980). Moreover, Gale diluted and effectively nullified this sweeping pronouncement by recognizing that federal legislation may either "specifically or implicitly" apply to the Trust Territory. Id. at 833 (emphasis added).

objective, Congress through 49 U.S.C. § 1508(a) expressly declared exclusive national sovereignty in all United States airspace. See City of Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624, 626-627, 93 S.Ct. 1854, 1856, 36 L.Ed.2d 547 (1973). Construed with § 1301(41)'s definition of the "United States", the § 1508(a) declaration manifests the intention to limit that definition and to extend the Federal Aviation Act only to areas under United States sovereignty. The United States has disavowed de jure sovereignty over the Trust Territory. See Porter v. U.S., 496 F.2d 583, 588 (Ct.Cl. 1974), cert.denied 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). Given the §1508(a) declaration, it would appear that for purposes of the original Federal Aviation Act the Trust Territory was not a territory or possession to which the statute applied.

Second, the Trust Territory fits within the description in 49 U.S.C. § 1510[7/]of areas which were initially immune from

_ _ _ _ _ _   _ _ _

7/    Title 49 U.S.C. § 1510 states:

> Whenever the President determines that such action would be in the national interest, he may, to the extent, in the manner, and for such periods of time as he may consider necessary, extend the application of this chapter to any areas of land or water outside of the United States and the overlying airspace thereof in which the Federal Government of the United States, under international treaty, agreement or other lawful arrangement has the necessary legal authority to take such action.

364

the Federal Aviation Act but subject to subsequent presidential extension of the legislation. Section 1510 empowers the President to apply the Act to areas "outside of the United States" where a treaty, international agreement or other lawful arrangement confers legal authority upon the United States to take such action. As indicated above, § 1508(a) restricts the meaning of the words "United States" to areas under United States sovereignty. Areas such as the Trust Territory which are not under United States sovereignty but otherwise under United States jurisdiction necessarily are areas "outside of the United States" for purposes of § 1510. The United States' governmental authority under Trusteeship Agreement Article 3 includes the power to apply federal law to the Trust Territory.[8/] Finally and equally as significant, neither the language nor the available legislative history of either the Trusteeship Agreement or the Federal Aviation Act indicates that the Trusteeship Agreement is not the type of "treaty" or "international agreement" contemplated by § 1510. For purposes of the 1958 Act, the Trust Territory was an excluded area provided for by § 1510 rather than covered by the substantive provisions of the Act itself.

— — — — —.— — — — —

[8/]    Trusteeship Agreement Article 3 provides:

> The administering authority shall·
> have full powers of administration,
> legislation, and jurisdiction over the
> trust territory, subject to any modifi-
> cations which the administering autho-
> rity may consider desirable such of the
> laws of the United States as it may deem
> appropriate to local conditions and
> requirements.

The Trust Territory never came within § 1513 before January 9, 1978. The President extended the Federal Aviation Act to § 1510 areas, and thus to the Trust Territory, to the extent necessary to accomplish the objectives of Titles III and XII (49 U.S.C. § 1314-1355 and § 1521-1523). Executive Order No. 10854, 24 Fed.Reg. 9695 (Nov. 27, 1959), as amended by Executive Order No. 11382, 32 Fed.Reg 16247 (Nov. 28, 1967), reprinted in 49 U.S.C. § 1510 note. This partial extension did not include Title XI, to which Congress added § 1513 in 1973. Neither Congress, the President nor a court decision extended any section of Title XI to § 1510 areas during the period after the enactment of § 1513 and before the enactment of the Covenant. Moreover, § 1513's purposes are unrelated to and unnecessary to the accomplishment of the objectives of Title III or Title XII.[9]

For the reasons above, § 1513 was inapplicable in the Trust Territory before January 9, 1978. There are no material factual issues concerning this question. Defendants are entitled as a matter of law to a partial summary judgment stating that § 1513 did not apply in the NMI before January 9, 1978.

— — — — — — — —

[9] Title III's purpose is to create a federal agency to promulgate air safety regulations, to manage national airspace, and to establish and enforce air traffic rules. See generally H.R.Rep. No. 2360, 85th Cong. 2d Sess., reprinted in 1958 U.S. Code Cong. & Ad. News 3741, 3745-3747, 3752-3755. Title XII's purpose is "to establish security provisions to permit the maximum use of navigable airspace by civil aircraft consistent with the national security." Title 49 U.S.C. § 1521. In contrast, the purposes of § 1513 include the prohibition of direct or indirect local governmental taxation of air fares and to permit local governments to assess reasonable service charges upon air carriers for airport use, including charges such as the DFSC which are calculated on the basis of "per passenger" formulas. See II-C-3, infra.

366

### B. Applicability of § 1513 in the NMI since January 9, 1978

Covenant § 502(a)(2) became effective on January 9, 1978 pursuant to a presidential proclamation required by Covenant § 1003(b). See Proclamation No. 4534, 42 Fed.Reg. 56593 (1977), reprinted in 48 U.S.C. § 1681 note. Section 502(a)(2) states that federal laws which apply in states and in Guam also apply in the NMI unless the Covenant provides otherwise.[10] Section 1513 applies in the states and in Guam. It is not one of the laws which the Covenant renders inapplicable.[11] It follows that § 1513 became applicable in the NMI on January 9, 1978. Island Air is entitled to a partial summary judgment declaring that fact.

- - - - - - - -

[10]

Covenant § 502(a)(2) states in relevant part:

> The following laws of the United States in existence on the effective date of this Section and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant.
>
> (2) Those laws... which are applicable to Guam and which are of general application to the several States as they are applicable to the several States.

[11]

Covenant § 105, § 503, § 805. See also Covenant § 402(b) and § 403(b) (suggesting the inapplicability of federal laws which conflict with the Covenant's provisions concerning treatment of the District Court of the Northern Mariana Islands as a court of the Northern Mariana Islands for purposes of determining jury trial and grand jury indictment requirements).

C.    The DFSC Does Not Violate 48 U.S.C. § 1513(a)

    1. The 1970 Airport and Airway Development Act
              and 48 U.S.C. § 1513

In 1970, Congress passed the Airport and Airway Development and Revenue Acts (the 1970 airport legislation).[12/] The purpose of this legislation was to promote the modernization, maintenance and expansion of the national commercial aviation system.  To accomplish this objective Congress created an Airport and Airway Trust Fund subsidized by an eight percent tax on domestic air passenger tickets.  See generally Massachusetts v. United States, 435 U.S. 444, 447-449, 98 S.Ct. 1153, 1156-1157, 55 L.Ed.2d 403 (1978); H.R. Rep. No. 91-601, 91st Cong.2d Sess., reprinted in 1970 U.S. Code Cong. & Ad. News (1970 USCAN) 3047, 3048-3059, 3085; Conf.Rep. No. 91-1074, 91st Cong 2d Sess. reprinted in 1970 USCAN at 3101-3102.

In Evansville-Vanderburgh Airport Authority District v. Delta Airlines, 405 U.S. 707, 709, 714, 720-721, 92 S.Ct. 1349, 1351, 1354, 1357, 31 L.Ed.2d 620 (1972), the United States Supreme Court held that charges of $1 per passenger for airport construction and maintenance do not violate the United States Constitution's Commerce Clause (Article I, Section 8, Clause 3). The charges were assessed by government-operated airports either directly against airline passengers or against

///

- - - - - - - - - -

12/  Title 49, U.S.C. § 1701 et seq; 26 U.S.C. § 4261, 4271.

368

airlines with authorization to pass on the cost to passengers. Id. at 709-710 and n.2, 714-715, 92 S.Ct. at 1351-1352 and n.2, 1354.

In response to Evansville, Congress enacted the 1973 Airport Development Acceleration Act (the 1973 Act), of which 48 U.S.C. § 1513 was part.[13/] Congress sought to overturn Evansville by prohibiting state and local governments from assessing passenger-paid "head taxes" or airline-paid use taxes on the transportation of air passengers. Noting the proliferation of these taxes in the wake of Evansville, the Senate Commerce Committee indicated that the taxes had frustrated the objectives of the 1970 airport legislation and impeded the traditional American right to travel. The committee made clear that it never intended to subject air passengers to state and local head taxes in addition to the eight percent national tax imposed by the 1970 airport legislation. See S.Rep. No. 93-12, 93rd Cong. 1st Sess. reprinted in 1973 U.S. Code Gong. & Ad. News 1434, 1435, 1446, 1450-1451, 1455 (1973 USCAN). In order to minimize the loss of local government revenues caused by the elimination of head taxes, the 1973 Act increased proportional federal funding for airport development.

— — — — — — — — —

[13/] The 1973 bill which became the Airport Development Acceleration Act was S.38. S.38 was essentially the same as a conference committee version of a 1972 bill, S.3755, which Congress enacted and President Nixon pocket-vetoed. See S.Rep.No. 93-12, 93rd Cong. 1st Sess. reprinted in 1973 U.S. Code Cong. & Ad. News 1434, 1436-1437; S.Rep.No. 92-1005, 92nd Cong. 2d Sess. (1972).

## 2. Statutory Construction Principles

In resolving the § 1513 issue presented here, the Court must construe § 1513 consistently with other sections of the legislative scheme of which the statute is part. Adams v. Howerton 673 F.2d 1036, 1040 (9th Cir. 1982). When two federal statutes are capable of coexistence, the court's duty is to regard each as effective, absent clearly expressed contrary congressional intent. Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); United States v. Hell's Canyon Guide Service Inc., 660 F.2d 735, 738 9th Cir. 1981). One statutory provision should not be construed so as to make another provision inconsistent or meaningless. Hughes Air Corp. v. Public Utilities Comm., 644 F.2d 1334, 1338 (9th Cir. 1981). Finally, the Court must construe § 1513 so as to avoid an absurd result. United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981).

### 3. Analysis

Island Air's essential position is that § 1513(a) bans any local tax or assessment calculated on a per-passenger basis. Relying upon § 1513(a)'s legislative history, Island Air contends that it would render § 1513(a) meaningless to accept defendants' argument that the DFSC is a permissible service charge under § 1513(a). Island Air submits that the adoption of defendants' interpretation would enable MIAA to circumvent § 1513(a) merely by labeling a head tax as a service charge and assessing it against airlines instead of directly against passengers.

Defendants reply that § 1513(a) does not prohibit all local airport charges computed on a per-passenger basis. They contend that Island Air's construction of § 1513(a) overlooks the 1973 Act's legislative history and renders § 1513(b) meaningless. Defendants maintain that Island Air's interpretation, if followed to its logical conclusion, would prohibit any § 1513(b) service charge. They reason that airlines necessarily would pass on a § 1513(b) charge to air passengers, and that therefore the airport authority imposing the charge would violate § 1513(a) by indirectly assessing charges "on persons traveling in air commerce." Defendants maintain that this is an absurd result which Congress could not have possibly intended.

After reviewing the structure and legislative history of § 1513 and the 1973 Act, the Court agrees with defendants. Island Air's persuasively framed argument founders because it rests upon the erroneous premise that § 1513(a) prohibits all local airport charges calculated on a per-passenger basis.

Although the construction of § 1513 begins with its language,[14] the parties' divergent readings of the statute reflect a textual ambiguity which necessitates an examination of the legislative history. Heppner v. Alyeska Pipeline Service Co, 665 F.2d 868, 871 (9th Cir. 1981). We turn first to the Senate-House conference committee report on the 1973 Act. Congressional committee reports receive greater weight in statutory construction

_ _ _ _ _ _ _ _ _

[14] Watt v. Alaska, 451 U.S. 259, 265-266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981).

than less formal legislative history material such as floor
debates. I.T.T. Corp. v. Gen. Tel. & Elect. Corp., 518 F.2d 913,
921 (9th Cir. 1975); see United States v. International Union, Etc.,
352 U.S. 567, 585, 77 S.Ct. 529, 538, 1 L.Ed.2d, 563 (1957).
This principle applies with particular force to conference committee
reports. "The [conference] committee's work at the end of the
course of legislation... makes it of crucial historical importance
in determining intent." Note, Conference Committee Materials in
Interpreting Statutes, 4 Stan.L.Rev. 257 (1952).

The Senate bill which became the 1973 Act was S 38.
See note 13, supra. The conference committee which considered
S.38 initially noted that § 7 of S.38 prohibited head taxes. The
committee then pointed out what it significantly described as
"two exemptions from this prohibition." Conf.Rep. Nr. 93-225,
93rd Cong.1st Sess., reprinted in 1973 USCAN at 1458 (emphasis
added). One of the exemptions was the provision eventually
enacted as § 1513(b). The committee explained that the head tax
prohibition "would not extend to the levy or collection of...
other charges such as reasonable rental charges, landing fees,
and other service charges from aircraft operators for the use of
airport facilities. " Id.. The committee did not alter § 7 in
any way which is relevant here.15/ Its statements and action thus
— — — — — — — — —
15/ The only change which the conference committee made was the
adoption of a House amendment creating a second exemption from
the head tax prohibition. The House amendment delayed § 1513(a)'s
effective date in jurisdictions which levied head taxes prior to
May 21, 1970. See Conf.Rep.No. 93-225, 93rd Cong. 1st Sess.,
reprinted in 1973 U.S. Code Cong. & Ad. Nes 1434, 1458-1459.

suggest that Congress intended to allow reasonable charges based upon a per-passenger formula provided that the charges were for space rental, landing privileges or other services provided by airports to air carriers.

This impression is reinforced by provisions in the 1970 airport legislation which Congress left intact when it passed § 1513. Congress is presumed to be aware of existing statutes when it enacts new legislation. Cannon v. University of Chicago, 411 U.S. 677, 696-697, 99 S.Ct. 1946, 1957-1958, 60 L.Ed.2d 560 (1979); 2A Sutherland Statutory Construction § 45.12 n.4 (4th ed. 1973). The conference committee's report confirms that Congress was aware of the 1970 airport legislation. See 1973 USCAN at 1458 (stating that references in the report to "existing law" refer to the Airway and Airport Development Act of 1970). Title 49 U.S.C. § 1718(a)(8)[16] directs that before an airport

_ _ _ _ _ _ _ _ _

[16] Title 49 U.S.C. § 1718(a)(8) states in relevant section:

As a condition precedent to his approval of an airport development project under this subchapter, the Secretary [of Transportation] shall receive assurances in writing, satisfactory to him, that:

the airport operator or owner will maintain a fee and rental structure for the facilities and services being provided the airport users which will make the airport as self-sustaining as possible under the circumstances existing at that particular airport, taking into account such factors as the volume of traffic and economy of collection. (emphasis added)...

operator may receive a federal airport development grant the operator must demonstrate that it maintains a rental and fee structure for facilities and services provided to airport users. Section 1718(a)(8) indicates that the "volume of traffic" is one factor which a rental and fee structure should take into account. Section 1718(a)(1)(A) further mandates that an airport operator must ensure that air carriers are subject to "non-discriminatory and substantially comparable rates, fee rentals and other charges." It is difficult to conceive how a fee structure may treat user airlines comparably and give due account to the volume of air traffic, as § 1718(a)(1) and (8) require, without factoring in the comparative number of emplaned passengers carried by the airlines.

This conclusion was implicit in the holding in Southern Airways Inc. v. City of Atlanta, 428 F.Supp. 1010 (N.D.Ga. 1977). In Southern Airways the court invalidated one section of a three-part formula for allocating airport maintenance and operation costs among airlines. Under the voided section, 20% of costs were to be borne equally by all carriers. The court noted the extreme disparity in the percentage of passengers and rental space accorded major airlines and that given to smaller carriers. Focusing on the relative number of passengers carried by major airlines and smaller carriers, the court held that the equal allocation provision was discriminatory and unreasonable, and therefore violated § 1718(a)(1). Id. at 1019. The Southern Airways court necessarily concluded, and this Court agrees, that

in order to comply with § 1718(a) airport fee schedules must consider the number of emplaned passengers carried by user airlines.[17]/

Section 1718(a) and § 1513 are both part of the federal legislative scheme for promoting and regulating airport development. Section 1718(a)(1) and § 1513(b) specifically concern rentals and other reasonable user, fees which airports may assess. Under the construction principles stated above in II-C-2, § 1718(a) and § 1513 must be read together and construed consistently if it is possible to do. In the absence of strong contrary evidence, the Court hesitates to rule that by enacting § 1513(a) Congress intended to prohibit airports from developing the very passenger-based rental and fee schedules which § 1718(a)(1) and (8) contemplate.

Plaintiff contends that strong evidence supporting its interpretation appears in the 1972 legislative history of S.3755. This vetoed bill was substantially identical to S.38, the bill which eventually became the 1973 Act. See note 13, supra. As initially drafted, § 1113 of S.3755 provided in relevant part:

> No State (or political subdivision thereof) shall levy or collect a tax, fee, head charge or other charge, directly or indirectly, on persons traveling in air transportation or the carriage of persons in air transportation,

----

[17]/ The court subsequently approved revised cost allocation formulas. It noted plaintiff's renewed objection that the revised formulas "do not accord the relative percentage of emplaned passengers the weight it deserves." Southern Airways Inc. v. City of Atlanta, 428 F.Supp. 1010, 1021 (N.D.Ga. 1477)

> or on the gross receipts derived therefrom, provided, however, that... nothing herein shall prohibit a State (or political sub-division thereof) owning or operating an airport from the levy or collection of reasonable rental charges, landing fees and other service charges for the use of airport facilities (<u>measured on other than a per passenger basis</u>).

S.Rep.No. 92-1005, 92d Cong. 2d Sess. 4 (1972)(emphasis added).

The Senate Commerce Committee separated § 1113 into two subsections and deleted the words "(measured on other than a per passenger basis)." See <u>id.</u> at 4-5. The committee indicated that, except for an amendment which did not affect § 1113, "all amendments... [were] of a technical or drafting nature and... [did] not reflect substantive changes in the bill." <u>Id.</u> at 7. During Senate deliberation on the amended bill, Senator Cotton expressed his understanding that S.3755 "does not preclude... charges against aircraft operators for the use of airports, <u>but not based on the number of passengers</u>." 118 Cong.Rec. 27816 (1972)(emphasis added). Senator Cannon, the bill's primary sponsor, replied: "the Senator is correct. It does not do away with landing fees, charges for space rental in terminal buildings, things of that sort." <u>Id.</u>. Relying upon these statements, Island Air maintains that passenger-based user charges were banned by S.3755, and thus by S.38.

This analysis fails for three reasons. First, the legislative history of a bill which was pocket-vetoed is not the best guide in ascertaining the meaning of a subsequently passed statute. <u>Red Lion Broadcasting Co. v. F.C.C.</u>, 395 U.S. 367, 381

n.11, 89 S.Ct. 1794, 1802 n.11, 23 L.Ed.2d 371 (1969). Whatever may be the significance of the evidence above in the interpretation of S.3755, it does not control the construction of § 1513 as finally enacted. Second, a congressional committee's deletion of language from a bill strongly militates against the conclusion that Congress intended a result which it expressly declined to enact. Gulf Oil Corp. v. Copp Paving Co. Inc., 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974). Although Island Air's reading of S.3755's legislative history is plausible, it is equally tenable that the excision of the words "(measured on other than a per passenger basis)" was a technical amendment to maintain the bill's consistency with 48 U.S.C. § 1718(a). Third, the colloquy between Senator Cotton and Senator Cannon does not have the interpretive value which Island Air ascribes to it. Comments made during legislative debate by persons other than those responsible for a bill's preparation or drafting are entitled to little weight. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 203 n.24, 96 S.Ct. 1375, 1386 n.24, 47 L.Ed.2d 668 (1976). Even the contemporaneous remarks of a bill's sponsor are not controlling in analyzing legislative history. Consumer Product Safety Commission v. GTE Sylvania Inc., 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980).

Recent federal precedent in Guam supports the conclusion that § 1513(a) does not prohibit reasonable user charges calculated on a per-passenger basis. In Island Aviation v. Guam Airport Authority, Civil Case No. 81-00063 (D.Guam Oct. 14, 1982),

Island Air alleged that a passenger-based arrival facility service charge and a sterile room holding charge violated § 1513(a). The arrival facility service charge was $1.65 per Guam terminating revenue passenger. The sterile room holding charges paid by Island Air ranged from $0.36 to $0.57 per passenger under a four-part formula. See id.; memorandum order at 3-4, appended to Defendants' Supplemental Memorandum. After carefully reviewing the language and enactment history of the 1970 airport legislation and the 1973 Act, the court upheld both charges. It determined that § 1513(a)'s purpose was to prohibit local taxes and head charges on the sale of air transportation. The court predicated this ruling upon its finding that Congress intended to prevent local government duplication of the national eight percent tax created by the 1970 airport legislation. See id. at 10.

This Court concurs in the Guam court's conclusion that § 1513(a)'s head tax prohibition extends only to local governmental taxes on air fares, rather than to all charges computed on a per-passenger basis. The stated purpose of the prohibition was to "ensure that passengers and air carriers will be taxed at a uniform rate -- by the United States." S.Rep.No. 93-12, reprinted in 1973 USCAN at 1435. The uniform national tax referred to above was described by the Congress which enacted it as a "ticket tax." H.R.Rep. No. 91-601, reprinted in 1970 USCAN at 3084. Senator Pearson, one of S.38's sponsors, similarly characterized the bill as prohibiting "State and local taxation of air fares." 119 Cong.Rec. 3350 (1973)(emphasis added). Although Senator

378

Pearson's statement is not controlling, it is substantiated by
the Guam district court's analysis and by other judicial decisions.
See State of Arizona ex rel. Arizona Department of Revenue v.
Cochise Airlines, 128 Ariz. 432, 626 P.2d 596, 600 (Ariz.App.
1980)(describing § 1513 as a prohibition against a tax on inter-
state or foreign air fares). See also Matter of Aloha Airlines Inc.
___ Haw. ___, ___, 647 P.2d 263, 270 (Haw. 1982), cert. granted
51 U.S.L.W. 3496 (Jan. 11, 1983)(indicating that § 1513(b) demons-
trates that Congress did not intend. § 1513(a) to broadly preempt
all local aviation taxes, and that therefore courts must "harmonize
the seeming contradictions consistenly with the [legislation's]
purpose").

For the reasons above, the Court grants partial summary
judgment to defendants and declares that: (1) the DFSC does not
violate § 1513(a)'s head tax prohibition; (2) that § 1513(b)
permits MIAA to assess the DFSC according to a reasonable per-
passenger basis formula; and (3) that Island Air owes MIAA
unpaid DFSC assessments in an amount to be determined in subse-
quent proceedings concerning the DFSC's reasonableness. This
ruling is consistent with § 1513's language and legislative
history. Even if § 1513(a) and § 1513(b) were inconsistent, the
Court would have to effectuate § 1513(b). Where two provisions
in the same statute conflict, the last provision in point of
arrangement controls. Lodge 1858, Am.Fed of Gov't Emp. v. Webb,
580 F.2d 496, 510 and n.31 (D.C.Cir. 1978), cert.denied 439 U.S.
927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978)(collecting cases).

### D. Leave to Amend the Complaint

Although the Court holds that § 1513(b) allows defendants to assess a DFSC formulated on a per-passenger basis, on the state of the record the Court cannot determine whether the DFSC is reasonable in the amounts formerly and presently assessed. Island Air seeks leave to amend its complaint with allegations challenging the DFSC's reasonableness. Leave to amend should be freely granted in the absence of undue delay, bad faith, dilatory motive, failure to cure previous deficiencies or undue prejudice. Foman v. Davis, 371 U.S. 178,,182, 83 S.Ct. 222, 230, 9 L.Ed.2d 222 (1962). Defendants have not challenged Island Air's request. The Court grants Island Air leave to amend its complaint and will enter an amended order[18]/in accordance with this decision.

_Feb. 24, 1983_
Date

_Alfred Laureta_
ALFRED LAURETA
United States District Judge

- - - - - - - - -

[18]/ In an order entered on January 3, 1983, the Court indicated that it granted defendants' motion for partial summary judgment for reasons to follow in a written decision. Because the order is interlocutory, it is subject to modification or rescission. See, e.g., Tanner Motor Livery Ltd. v. Avis, 316 F.2d 804, 809 (9th Cir. 1963), cert.denied 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963); Diaz v. Diaz, Civil Action No. 81-0058, Amended Decision at 4 (D.N.M.I. Nov. 3, 1982). The Court's amended order will reflect the grant of Island Air's motion for leave to amend and its motion for partial summary judgment declaring that § 1513 has applied in the NMI since January 9, 1978.